GENERAL RAILWAY SIGNAL COMPANY *v.* COMMONWEALTH OF VIRGINIA AT THE RELATION OF THE STATE CORPORATION COMMISSION.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF VIRGINIA.

No. 177. Argued March 11, 1918.—Decided April 15, 1918.

A foreign corporation, for lump sums, made and performed contracts to furnish completed automatic railway signal systems in Virginia, in the performance of which the materials, supplies, machinery, devices and equipment were brought from without, but their installation, as structures permanently attached to the soil, required employment of local labor, digging of ditches, construction of concrete foundations, and painting. *Held*, that local business was involved, separate and distinct from interstate commerce, and subject to the licensing power of the State. *Browning* v. *Waycross*, 233 U. S. 16.

The Virginia law imposing a fee for the privilege of doing local business of $1,000 on foreign corporations with capital over $1,000,000 and not exceeding $10,000,000 (Acts 1910, c. 53, § 38a), *upheld*, as not arbitrary or unreasonable under all the circumstances, though the case is on the border line.

118 Virginia, 301, affirmed.

THE case is stated in the opinion.

*Mr. Hugh Satterlee,* with whom *Mr. Hiram R. Wood* was on the brief, for plaintiff in error:

Just what did the defendant do in Virginia? It employed there about 20 men—11 signal engineers and experienced men and 9 laborers—for possibly four or five months altogether. They erected iron signal masts about two miles apart and fitted on them alternating current induction motors, signal arms, gears, relays and housings, transformers, line arresters, etc. To reach the rails they dug short, shallow trenches, to an aggregate amount of not over 1,600 feet in a hundred miles. The Southern Railway Company furnished and put up the necessary wooden poles and wires. The defendant's men applied the last coat of paint to the signal apparatus, the first coats having been applied at the factory.

The defendant did these things in Virginia only because it could not do them in New York, and it had no desire or intention to establish its business in Virginia. Because of the nature of the defendant's products it was a complicated, tedious job to install them ready for use, but the defendant was in Virginia for that purpose and no other. It was merely completing a sale to the Southern Railway Company, and it did no business and had no relations with the citizens of Virginia except for hiring a few laborers.

In short, the defendant was doing in the State isolated acts incidental to its manufacturing and selling business conducted in New York. These acts completed, it might or might not ever again have so much as one employee in the State. To force such a casual, occasional entrant to secure a license to do business, continuously to maintain an office, to pay a license tax of $1,000 and an annual registration tax, would be, we respectfully submit, the height of injustice. The very language of the statutes

regulating foreign corporations doing business in the State is manifestly ill chosen to achieve such a result.

This court early decided that single transactions in a State by a foreign corporation, even in the conduct of its ordinary business, did not constitute "doing business." *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S. 727.

Of course, the whole subject of "doing business" is interwoven with the effect of the commerce clause of the Constitution and many decisions assign one ground or the other apparently without much discrimination. More accurately speaking, however, if a foreign corporation is not doing business, there is no need to discuss the commerce clause, while if it is doing business, it may still be relieved from compliance with state statutes if its business be interstate.

A collateral line of cases throws an illuminating sidelight upon this difference. It is held that a foreign corporation is not subject to process in a State unless it is doing business there, but that a corporation may be doing business in a State for the purpose of suit against it, if continuously in the State, while not subject to state foreign corporation laws because engaged in interstate commerce. *International Harvester Co.* v. *Kentucky,* 234 U. S. 579.

To the same effect are *St. Louis Southwestern Ry. Co.* v. *Alexander,* 227 U. S. 218; *Washington-Virginia Ry. Co.* v. *Real Estate Trust Co.,* 238 U. S. 185; *Tauza* v. *Susquehanna Coal Co.,* 220 N. Y. 259. But when the corporation is not doing business in the State, service there on its officers is invalid. *Riverside Cotton Mills* v. *Menefee,* 237 U. S. 189; *Philadelphia & Reading Ry. Co.* v. *McKibbin,* 243 U. S. 264.

It should not be difficult to perceive the very substantial difference between the position of the Harvester Company, in the above decision, which was continuously in the State by its many agents, engaged in a permanent course of business, and was accordingly held to be doing

business there, although immune from state regulation because its business was interstate, and the position of the General Railway Signal Company, which entered Virginia temporarily for the sole purpose of completing definite sales already made to one customer, and was not doing business there, aside from any application of the commerce clause.

Inability readily to start an action against a foreign corporation is no justification for requiring the registration of such a corporation, unless it be actually doing business in the State and business that is not interstate commerce.

*A fortiori,* if a corporation is not doing business in a State for the purpose of service of process upon it, it is not doing business for the purpose of the statutes regulating foreign corporations.

In determining whether or not a foreign corporation is doing business in a State, we respectfully but earnestly submit, there are two fundamental questions.

*First, is the corporation in the State temporarily or permanently?* It is there temporarily if it is making one or more occasional sales, if it is doing one or more definite pieces of work for specified persons. It is there permanently if it maintains an office or a resident force of salesmen in the State. If it is there only temporarily, a further question must be put:

*Second, what is the business of the corporation?* If the corporation manufactures and sells machinery, for example, at a plant outside the State and enters the State only to make deliveries or to install or erect machinery which from its nature could not be shipped ready for operation, then the corporation is not doing business, *its* business, in the State. If, however, the business of the corporation is contracting or constructing, employing materials which it buys indiscriminately wherever it can, then, wherever it moves its construction plant, it is doing

business, *its* business. The actual *work* in the State that is done by both corporations may be exactly the same, but one may be doing business in the State and the other not. This obvious point, clear from many cases, the courts below missed altogether. See *Buffalo Refrigerating Mach. Co.* v. *Penn Heat & Power Co.*, 178 Fed. Rep. 696.

For several reasons, only one of which needs immediate mention, *Browning* v. *Waycross*, 233 U. S. 16, is no authority for the complainant, and, on the contrary, provides an illustration of our position. The defendant, an individual agent, was convicted under a local ordinance for carrying on the business of erecting lightning rods without a license. As a matter of fact, he *had* carried on the business,—he admitted it,—and no doubt his employer, the foreign corporation, was doing business in Georgia. By every criterion we have advanced that would be so. The foreign corporation was by fair inference permanently and continuously in the State (see our first question above). Whether or not, though doing business, it was subject to a state license tax, is another question. But the present defendant, unlike the defendant or his employer in *Browning* v. *Waycross*, has not been carrying on a continuous course of business in Virginia. *Cf. Williams, Inc.,* v. *Golden & Crick*, 247 Pa. St. 397, and *Delaware River Constr. Co.* v. *Bethlehem & Nazareth Ry. Co.*, 204 Pa. St. 22.

Even if the plaintiff in error were held to be doing business in the State of Virginia, its business was interstate commerce and was protected by the Federal Constitution against state burdens. *International Textbook Co.* v. *Tone*, 220 N. Y. 313; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489; *Stockard* v. *Morgan*, 185 U. S. 27. As it is proper to procure orders in the State, so it is necessary to deliver there the goods ordered. They need not be shipped directly to the purchaser, but may be delivered in any rea-

sonably convenient way. *Caldwell* v. *North Carolina,* 187 U. S. 622; *Rearick* v. *Pennsylvania,* 203 U. S. 507; *Western Oil Refg. Co.* v. *Lipscomb,* 244 U. S. 346. The retention of title and possession until payment upon delivery in the State does not rob the transaction of its character as interstate commerce. *Norfolk & Western Ry. Co.* v. *Sims,* 191 U. S. 441. Even the exercise in a State of an option to purchase, given in connection with an interstate sale, is protected by the commerce clause if as a practical matter the business is one affair. *Davis* v. *Virginia,* 236 U. S. 697. The right to enforce payment for interstate sales is so essential to interstate commerce as to be protected by the commerce clause. *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197. If interstate sales are made from goods kept in a warehouse in the State for shipment from time to time out of the State, no license can be imposed on the seller. *Heyman* v. *Hays,* 236 U. S. 178.

The installation of its signals in Virginia by the plaintiff in error was just as necessary to its interstate commerce as any of the acts within the State involved in the foregoing decisions.

Realizing the difficulty of applying rules to so complex a subject, we yet believe that the solution of the problem can usually be made easy by ascertaining the answers to two further questions, which partly overlap our former.

First, is the essence of the transaction, taken as a whole, the interstate sale or the work done in the State? In other words, which is only accessory to the other? The essence of the transaction is the sale if the corporation manufactures or deals in goods for which it is seeking an outlet. The essence of it is the work done if the corporation is a contractor, having little or nothing to sell but its services.

Second, is the work done in the State reasonably incidental or necessary to the consummation of the interstate sale? Fortunately in our case the answer is clear.

The evidence shows that the signals sold the railway were complex and intricate and required installation by specially trained experts; that they could not be put together before shipment; that the manufacturer's trained employees were best-fitted to install them; that the Southern Railway Company had no signal organization competent to install the signals; and that the installation by the manufacturer was necessary to effect the sale. It is immaterial, therefore, if the General Railway Signal Company had in Virginia twenty employees (as they had), or a hundred,—off and on for a few months (as they did), or continuously for years,—if the plaintiff in error was primarily engaged in selling its signals, and its employees, wherever hired or residing, were engaged in completing such sales.

If, although the contractor furnishes them from outside the State, the materials are readily purchasable in the market and it is only their assembly in a certain manner within the State that alters them from general usefulness and adaptability into the specific structure desired, then it is likely that the work in the State is the essence of the transaction. But if the contractor at its plant outside the State manufactures more or less ordinary materials into definite apparatus, which already has a unique character before its shipment into the State, then the necessary assembly in the State of that apparatus into the completed whole for which it was solely adapted before shipment cannot outweigh the interstate commerce. *Browning* v. *Waycross*, fairly read, is at best no authority for the complainant and actually supports the test questions which we have above suggested.

The imposition of a tax upon the entire capital stock of the plaintiff in error as a condition of its doing intrastate business in connection with its interstate business is repugnant to the Federal Constitution.

The inability of the defendant to perform the work of

installation in Virginia would have prevented or at least seriously embarrassed its confessedly interstate sale to the Southern Railway Company. Permission by Virginia, therefore, only upon a burdensome condition to put together the signals in Virginia would have a very direct effect upon the interstate commerce in which the defendant was engaged.

Assuming that the defendant was engaged in intrastate business in its installation work, yet the State could not impose as a condition of its doing such business, closely and inseparably connected as it was with its interstate business, which admittedly the State could not prevent, a tax upon the defendant's entire capital stock. As above indicated, a tax measured by the proportion of the defendant's capital stock represented by property owned and used in the State would have been proper, which confirms the validity of the defendant's contention that it was not doing business in Virginia, for the proportion of the defendant's capital stock represented by property owned and used in the State is now and always has been zero.

In the installation alone of its signals upon the Southern Railway the plaintiff in error was engaged in interstate commerce. Whoever was engaged in installing the signals in the present case, partly to replace old signals, was engaged in maintaining and improving an instrumentality of interstate commerce, and was consequently engaged in interstate commerce. If the employees were engaged in interstate commerce, naturally the employer was likewise. *Pedersen* v. *Delaware, Lackawanna & Western R. R. Co.*, 229 U. S. 146, and other cases.

It is true, as indicated in the *Pedersen Case*, that a workman engaged in the laying out of a new railroad or the construction of a bridge in connection therewith is not engaged in interstate commerce. The commerce does not begin until the breath of life is infused into the com-

pleted work, until operation is begun. But the Southern
Railway was a road in actual operation. The installation
of the signals was a work of maintenance, done in pur-
suance of the duty of the carrier to correct any insuffi-
ciency in its appliances or other equipment. The signal
workers were altering and repairing, as in the *Pedersen
Case*, a living, pulsating instrumentality of interstate
commerce. See *Eng* v. *Southern Pacific Co.*, 210 Fed.
Rep. 92; *Chrosciel* v. *New York Cent. & H. R. R. R. Co.*,
174 App. Div. 175.

Whoever does it, the work of installing signals through
different States on interstate lines is indissolubly con-
nected with interstate commerce. To hold otherwise
would be to permit any State capriciously to prevent the
installation of a uniform system of signals along interstate
railways, beyond question a matter of national concern.

The Urgent Deficiency Act of October 22, 1913, con-
tained an appropriation to enable the Interstate Com-
merce Commission "to investigate and report in regard
to the use and necessity for block signal systems," and
the Commission has repeatedly urged enactment by Con-
gress of a law compelling their adoption. *Cf. Haskell* v.
*Cowham*, 187 Fed. Rep. 403, and *California* v. *Central
Pacific R. R. Co.*, 127 U. S. 1.

*Mr. J. D. Hank, Jr.*, Attorney General of the State of
Virginia, for defendant in error.

Mr. JUSTICE McREYNOLDS delivered the opinion of the
court.

Plaintiff in error seeks reversal of a judgment of the
Supreme Court of Appeals of Virginia which affirmed an
order of the Corporation Commission imposing a fine upon
it for doing business within the State without first obtain-
ing proper authority.

The essential facts concerning business done as found by the Commission and approved by Supreme Court are these:

"The defendant is a corporation of the State of New York, having an authorized capital of $5,000,000. Its principal office and factory is at Rochester, N. Y., where it owns and operates a large manufacturing plant devoted to the manufacture of materials chiefly used in the construction of railway signals which it sells and constructs all over the world. It has a branch factory at Montreal, Canada, and maintains branch offices in New York City, Chicago, and San Francisco.

"By contract dated the fifth day of May, 1914, with the Southern Railway Company, the defendant agreed to furnish certain materials, supplies, machinery, devices and equipment, as well as all necessary labor, and to install, erect, and put in place certain signals and apparatus shown on the plans and described in the specifications, from Amherst to Whittles, Virginia, fifty-eight miles, and to 'complete the entire system and turn same over to the railway company as a finished job,' subject to inspection and acceptance, for $85,597. Similar contracts had been previously made and fully performed, one dated September 6, 1911, covering the lines of the Southern Railway in Virginia from Monroe to Montview, Virginia, thirteen miles, for $16,015, and one dated July 18, 1913, from Orange to Seminary, Virginia, seventy-six miles, for $112,428. The aggregate distance in this State covered by these contracts being 147 miles, and the total consideration being $214,040.

"The purpose of these signals is to promote safety of railway operation and they operate automatically.

"In order to construct these signals as required by the contract it was necessary to employ in this State labor, skilled and unskilled, to dig ditches in which conduits for the wires are placed, to construct concrete foundations,

and to paint the completed structures. The completed structures are along the side of the railway track, about two miles apart, and are twenty-two or twenty-three feet high.. In the language of the witness, Moffett:'It is necessary to erect the signal mechanism, the masts supporting the mechanism, the houses for protecting the relays, reactors, reactants and other similar electrical devices protected from the weather, then the transformers, high tension line arrestors and low tension line arrestors.' The completed structures are permanently attached to the freehold upon concrete bases."

We think the recited facts clearly show local business separate and distinct from interstate commerce within the doctrine announced and applied in *Browning* v. *Waycross*, 233 U. S. 16.

It is further insisted that as the amount of prescribed entrance fee is based upon maximum capital stock it constitutes a burden on interstate commerce, contrary to the Federal Constitution.

Section 38a, c. 53, Acts of Virginia, 1910 (copied in margin) [1] requires every foreign corporation with capital

---

[1] "Sec. 38a.  Every foreign corporation, when it obtains from the State corporation commission a certificate of authority to do business in this State, shall pay an entrance fee into the treasury of Virginia, to be ascertained and fixed as follows:

"For a company whose maximum capital stock is fifty thousand dollars or less, thirty dollars; for a company whose capital stock is over fifty thousand dollars, and not to exceed one million dollars, sixty cents for each one thousand dollars or fraction thereof; over one million dollars, and not to exceed ten million dollars, one thousand dollars; over ten million dollars, and not to exceed twenty million dollars, one thousand two hundred and fifty dollars; over twenty million dollars, and not to exceed thirty million dollars, one thousand five hundred dollars; over thirty million dollars, and not to exceed forty million dollars, one thousand seven hundred and fifty dollars; over forty million dollars, and not to exceed fifty million dollars, two thousand dollars; over fifty million dollars, and not to exceed sixty million dollars, two thousand two hundred and fifty dollars; over

over one million and not exceeding ten million dollars when it obtains a certificate of authority to do local business to pay a fee of one thousand dollars. Inspection of the statute shows that prescribed fees do not vary in direct proportion to capital stock and that a maximum is fixed. In the class to which plaintiff in error belongs the amount specified is one thousand dollars and, under all the circumstances, we cannot say this is wholly arbitrary or unreasonable.

Considering what we said in *Baltic Mining Co.* v. *Massachusetts*, 231 U. S. 68; *St. Louis Southwestern Ry. Co.* v. *Arkansas*, 235 U. S. 350; *Kansas City, Fort Scott & Memphis Ry. Co.* v. *Kansas,* 240 U. S. 227; *Kansas City, Memphis & Birmingham R. R. Co.* v. *Stiles*, 242 U. S. 111, the two characteristics of the statute just referred to must be regarded as sufficient to save its validity. It seems proper, however, to add that the case is on the border line. See *Looney* v. *Crane Co.,* 245 U. S. 178; *International Paper Co.* v. *Massachusetts, ante,* 135, and *Locomobile Co.* v. *Massachusetts, ante,* 146.

The judgment of the court below is

*Affirmed.*

---

sixty million dollars, and not to exceed seventy million dollars, two thousand five hundred dollars; over seventy million dollars, and not to exceed eighty million dollars, two thousand seven hundred and fifty dollars; over eighty million dollars, and not to exceed ninety million dollars, three thousand dollars; over ninety million dollars, five thousand dollars; provided, however, that foreign corporations without capital stock shall pay fifty dollars only for such certificate of authority to do business in this State.

"For the purpose of this act the amount to which the company is authorized by the terms of its charter to increase its capital stock shall be considered its maximum capital stock."