## NORTH AMERICAN SERVICE CO. v. A. T. VICK CO. (No. 850.)

(Court of Civil Appeals of Texas. Beaumont. June 19, 1922.)

**1. Corporations ⬅642(1)—Erecting signs for advertising, etc., held "doing business" within state.**

Where a foreign corporation made signs for advertising out of the state and sent them within the state, and bought lumber for posts, fixed the signs to the posts, and set the signs up, and protected and repaired them by labor within the state in which the corporation maintained a corps of servants to carry on such work, the corporation was "doing business" within the state, so that it could not sue on a contract for erecting billboards without complying with Rev. St. art. 1318, requiring it to file its articles of incorporation for the purpose of procuring a permit to do business in the state before it could maintain a suit therein.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

**2. Corporations ⬅672(7)—Defense that corporation had no permit to do business within the state held raised by general denial.**

In an action by a foreign corporation, alleging a permit to do business in the state, the defense that it had no permit was raised by defendant's general denial.

Appeal from Harris County Court; John W. Lewis, Judge.

Action by the North American Service Company against the A. T. Vick Company. From judgment for defendant, plaintiff appeals. Affirmed.

Byers & Cavanaugh, of Houston, for appellant.

R. W. Franklin, of Houston, for appellee.

WALKER, J. We take the following statement of the nature and result of the suit, from appellee's brief:

"The appellant alleged a contract with the defendant company made on the 11th day of August, 1919, under the terms of which the appellant was to erect ten billboards 4 feet long by 5 feet wide, made out of sheet metal, upon which certain advertising was to be placed, and to said advertising placard was to be attached a wooden post. This advertisement was to be stuck in the ground on the roads leading out of the city of Houston, and the appellee was to pay appellant $30 per month for the same running over a period of 24 months. Appellant agreed to inspect every 90 days and replace any of said boards that might be destroyed without extra cost to appellee. The contract remained in force for 24 months, and, unless canceled, automatically extended itself for a period of another 24 months. Appellant alleged that it carried out its contract, and also alleged that it was a corporation with its principal office and place of business in Cooke

county, Ill., with a permit to do business in the state of Texas.

"Appellant filed an answer in said cause setting up its defense in due order, but without filing any plea in abatement. Thereafter some time in the March term appellant propounded interrogatories to the president of its company, and by reason of certain cross-interrogatories defendant ascertained that the allegation in plaintiff's petition that it had a permit to do business in Texas was untrue, and thereupon filed its amended answer at the May term setting up a plea in abatement, copy of which plea was given to plaintiff's counsel on or about the 3d or 4th day of May, at the opening of the term, but the same was not filed until the case was called for trial, June 15th, at which time appellant admitted in open court that the appellant had no permit to do business in Texas at the time the contract inquired about was executed, nor has it had any since that time. The record shows that nothing was done in this case to prejudice or waive said plea in abatement after it was discovered that the statement of counsel in his petition was not true.

"Appellant's president testified the company had the following salesmen in Houston territory between March, 1919, and March 1920: H. L. Rudnick, W. A. Saums, C. C. Skiles, F. M. Rust, and H. A. Manning; inspectors, W. C. Adkins and J. J. Schuler, with E. Morrow in charge of the construction men. 'We (appellant) completed our part of the contract on or about October 20, 1919. We maintained an inspection officer on all of the signs after their erection. This consists of an inspection by our inspector once about every 90 days. In answer to your question—the Vick people gave us written instructions on which roads leading into Houston they wanted the ten signs erected. We did this and have maintained same up to this time in accordance with our agreement.'

"Mr. Skiles testified: That he worked for the defendant company in the summer of 1919 representing the company in Texas. That the company gave him ten days training in Houston before they sent him to North Texas. That his duties were to take the miniature sign for samples and explain the proposition thoroughly as to how the signs would be erected, cost of the signs and length of the contract, and what the company agreed to do and everything with reference to the selling of the signs. That he sold some signs in Texas in August and September, 1919. In these contracts the company agreed to erect the signs along the roads leading into the different cities, which signs were to be inspected once every 90 days, and any mutilated signs, or blown down or shot full of holes signs, were to be replaced by the company. That they were to erect these signs and keep them up in order and repair. It is usual and customary for such signs to be knocked down by boys and shot at by people driving along the road; especially where they are located close to towns, they are scarred up pretty badly by boys throwing rocks at them, but the main cause of destruction of these signs was hunters and people driving along the road. They would shoot at them, and when they could shoot at one of those signs with a shotgun it would blow a hole the size of your fist in them. Appellant was to keep these signs in repair, keep them up, and if they got shot down or

scarred up they were to repaint them. They were supposed to maintain a construction bureau to do this with. The signs were erected on posts approximately 6x6 inches and the posts were 12 feet high, 3 feet in the ground, and 9 feet out of the ground. The signs were prepared in Chicago and shipped down here. The posts upon which to erect them were obtained from the Burton Lumber Company in Houston, Tex., and then the signs were put on the posts. I wrote approximately 12 contracts similar to the one sued on in the summer and fall of 1919. 'Q. Now, then, as I understand your testimony, the contract was made in Texas and sent to Chicago, with sketch; the sign part of it was then prepared in Chicago, then sent down to Texas and the North American Service Company's agent purchased in Texas from the Burton Lumber Company, at Houston, Tex., these sticks. That the signs were then attached to the sticks and erected by the company on the roads leading out of Houston or whatever the town on which was—or out of the town where the contract was supposed to have been taken. That the North American Service Company obligated itself to keep these signs in good order and condition for two years, inspecting them about every three months? A. Yes, sir.'

"A. T. Vick testified he was president of the defendant company, but did not make the contract involved in this suit, but made a similar one for defendant company's garage. They agreed to put up the signs and maintain them for a period of a year, and have an inspector go over the signs once every 90 days. Their solicitor told me he had approximately 50 of these contracts the day I signed that contract."

Appellant's suit was for a balance due under the contract after allowing certain credits. On a trial to the court without a jury, judgment was entered dismissing appellant's suit, for the reasons given by the court in his judgment:

"That the plaintiff was doing business in the state of Texas at the times and in the matters set forth in plaintiff's petition, and plaintiff cannot prosecute its said suit because of article 1318 of the Revised Statutes of Texas, and that defendant's plea in abatement should be sustained."

## Opinion.

[1] The judgment of the trial court must be sustained. The contract between appellant and appellee was an intrastate transaction, and was not the subject of interstate commerce. This follows because (a) the lumber for the posts was bought in Houston, Tex.; (b) the signs were fixed to the posts in Houston, Tex.; (c) the posts were set in holes dug by Houston labor, and the signs protected and repaired by Houston labor; (d) appellant maintained in this state a corps of servants to do the work just enumerated. These things were all of a purely local character and constituted doing business in Texas. Browning v. Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828; Signal Co. v. Virginia, 246 U. S. 500, 38 Sup. Ct. 360, 62

L. Ed. 854. As said by the Supreme Court of the United States in the first case cited:

"Such business was wholly separate from interstate commerce, involved no question of the delivery of property shipped in interstate commerce or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated."

These facts clearly distinguish this case from York Manufacturing Co. v. Colley, 247 U. S. 21, 38 Sup. Ct. 430, 62 L. Ed. 965, 11 A. L. R. 611.

[2] The defense that appellant had no permit to do business in Texas was raised by appellant's general denial. Taber v. Int. Bldg. & Loan Ass'n, 91 Tex. 92, 40 S. W. 954. Therefore we cannot sustain appellant's proposition that appellee had waived his right to urge this defense by not pleading it in the first term of court.

Appellant's assignments against the admission of certain evidence show no error, as they are not sufficiently supported by a statement from the record.

Finding no error in the trial of this case below, the judgment of the trial court is in all things affirmed.