# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## THE WESTERN GAS CONSTRUCTION COMPANY V. COMMONWEALTH OF VIRGINIA.

### January 20, 1927.

FOREIGN CORPORATIONS—*"Doing Business"* in *Virginia—License—Sales—Addition to a City Gas Plant—Case at Bar.*—In the instant case the question at issue was whether appellant, a foreign corporation, was subject to a fine for "doing business" in Virginia without having first obtained a license under section 3847 of the Code of 1919. Appellant made a contract with the city of Richmond for the sale, assembling, installation and erection of certain gas machines and equipment. The equipment consisted of a water gas generator set and was shipped from the home office of appellant from Indiana to Richmond and there installed. The work in Richmond in addition to the assembling of the metal apparatus, consisted of lining the three units of the water gas generator system with firebrick and was completed in something over three months. Local laborers were employed under the supervision of experts from the home office.

*Held:* That the essence of the undertaking of appellant was that of construction and the sale of the equipment and apparatus was an incident of the construction job rather than the construction 'an incident of the sale; and, therefore, appellant was subject to a fine for "doing business" in Virginia without having obtained a license.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*John St. Clair Brooks, Jr., M. J. Fulton, D. M. Gilmore, T. J. Michie, Jr.,* and *J. Taylor Thompson,* for the appellants.

*John R. Saunders, Attorney General,* and *Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys Gen-*

*eral,* and *C. M. Chichester, Counsel State Corporation Commission,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The State Corporation Commission has certified to this court its "findings of fact and statement of reasons," from which we make the following extract:

"The question before the State Corporation Commission in this matter arises upon a rule to show cause against the Western Gas Construction Company why it should not be fined for doing business in Virginia without first obtaining a license under section 3847, Code of Virginia, 1919, and involves the determination of what constitutes 'doing business' in a technical sense, as applied to the facts surrounding the activities, as hereinafter set forth, of the Western Gas Construction Company in the State of Virginia.

"The following are the facts found from the record, and the conclusions of fact reached by the Commission:

"The Western Gas Construction Company is a foreign corporation, incorporated under the laws of the State of Indiana, and it has not taken out a license to do business in Virginia under the provisions of section 3847, upon the claim that its business is interstate and not within the requirements of section 3847.

"This corporation made contracts for the sale, assembling, installation and erection of certain gas machines and equipment in the city of Richmond and in the city of Winchester, the former with the city of Richmond, through the department of public utilities, and the latter with the Winchester Gas Company, a Virginia corporation, and in each case the contracts involved extensive construction work in the cities of Richmond and Winchester, respectively, the details of

which appear in the various contracts and specifications filed as exhibits.

"The equipment consisted of several units of a gas generating machine and apparatus known as a water gas generator set, and was shipped from Fort Wayne, in the State of Indiana, the home office of the Western Gas Construction Company, to Richmond and Winchester, respectively, and in these places the assembling was to be completed, the equipment and apparatus installed, erected, constructed, tested, and put into operation in accordance with the specifications of the contracts and schedules attached.

"The equipment was manufactured and assembled as far as practicable, at Fort Wayne, Indiana, before shipment, and the balance of the undertakings of the contracts were performed at the lower gas works of the city of Richmond and at the gas plant of the Winchester Gas Company, respectively.

"The work at Richmond, and the same is true of the work at Winchester, in addition to the assembling of the metal apparatus, consisted of lining the generator, carburetor and superheater, terms applicable to the three units of the water-gas generator system, with firebrick. The necessary firebrick consisted of 102 different shapes and sizes manufactured according to special specifications, as well as some standard sizes, about one-tenth, ordered from stock.

"The firebrick was secured from Parker-Russell Company, St. Louis, Mo., and shipped direct to the job, and most of it was manufactured for the particular job.

"All equipment and other necessary material were delivered in cars to the Western Gas Construction Company at the lower gas works, in care of the department of public utilities, city of Richmond, and similarly in the case of the Winchester contract.

"The fire brick lining is laid in a manner similar to the laying of firebrick in other cases, with cement filler between the bricks, and the laying has to be under expert supervision.

"Great skill and care and experienced workmanship are required and the work was supervised by an expert and three assistants from the home office of the Western Gas Construction Company.

"The work was commenced on the 28th and 25th of July, 1925, in Richmond and Winchester, respectively, and was to be completed, according to the terms of the contract, by November 1st, thus involving, provided it was completed upon schedule time, something over three months.

"Eleven local common laborers were employed on an average on the Richmond job and about seven on the Winchester job under the supervision of the experts from the home office.

"Some incidental materials were secured locally.

"Some reshaping of the bricks was necessary around the openings in the course of the laying of the firebrick lining and this shaping was done by the bricklayers.

"The undertaking of the Western Gas Construction Company involved, in addition to the assembling, installation and erection of the three units of the water-gas set, the making of all connections between this water-gas set and a waste heat boiler erected by the Bass Foundry and Machine Company, of Fort Wayne, Indiana, an entirely different concern, and the undertaking of the Western Gas Construction Company also included the making of all connections between the water-gas set installed by it and between the waste heat boiler installed by the Bass Foundry and Machine Company, and between these and the existing apparatus of the Richmond gas works.

"The foundations were made by the city of Richmond.

"The Western Gas Construction Company was to operate the water-gas generator set for one week and demonstrate the results which it had guaranteed.

"The amount involved in connection with the water-gas generator set was $30,750, and the amount for the connection was $6,432.

"It is proposed by the Western Gas Construction Company to take other similar contracts in Virginia if and when they can be secured.

"While expert supervision was essential, due to the intricate character of the apparatus and the necessity of correct fittings and adjustments, and while the furnishing of this expert supervision by the Western Gas Construction Company was the most economical and practicable plan, it would have been possible for the expert supervision to have been done and the work performed according to the blue prints and specifications by experts other than those of the manufacturing company.

"The essence of the undertaking of the Western Gas Construction Company was that of construction varying in degree rather than kind from other construction jobs and in the view of the Commission the sale of the equipment and apparatus was an incident of the construction job rather than the construction a mere incident of the sale. The Western Gas Construction Company was the successful bidder, as far as the Richmond work was concerned, in an offer for bids by the city of Richmond for the furnishing of the materials and equipment for and the *construction* of certain portions of its gas plant, and it was *not* a necessary incident that the bidder should be the manufacturer and seller of the generator system.

This was a detail rather than a necessary feature of the bid. Therefore, the city of Richmond did not buy certain equipment and apparatus from the Western Gas Construction Company, but rather the Western Gas Construction Company was the successful bidder for the completion, according to certain specifications, of certain *construction* work at the lower Richmond gas works, involving the furnishing of equipment and apparatus, that would produce certain results and conform to certain specifications, and all other materials, all labor, and everything necessary to the completion of the construction. It is true that certain modifications in the specifications were made by mutual consent in order to conform them to the apparatus manufactured by the Western Gas Construction Company. *Non constat,* the Western Gas Construction Company could have acquired the apparatus from other sources just as it did certain of the material necessary to the completed job.

"From the foregoing facts and deductions the State Corporation Commission is of the opinion that the Western Gas Construction Company is doing business in the State of Virginia, and is liable, under the provisions of section 3848 of the Code, for having failed to take out a license to do business in Virginia, and that this case is controlled by the decision of the *General Railway Signal Company Case,* Report of the State Corporation Commission, 1914, page 31, and by the reasoning in the opinion by Judge Prentis, now President of the Supreme Court of Appeals of Virginia, then chairman of the Commission, which decision was subsequently affirmed by the Virginia Supreme Court of Appeals, 118 Va. 301, 87 S. E. 598, and by the United States Supreme Court, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854."

The appellant makes no complaint of any inaccuracy in the foregoing statement of facts.

It appears from the record that the city of Richmond advertised for proposals for furnishing materials and construction, according to specifications, of certain additions to its gas plant, and that the bid of the appellant was accepted. As a result of such acceptance, two contracts were entered into between appellant and the city, which are set out in the record. At the same time the city made a contract with another corporation to erect for it, in connection with its gas plant, a "waste heat boiler."

In each of the contracts between the city and appellant certain specifications were annexed to and made parts of the contracts. The consideration for the contract, which we will designate as No. 1, was $37,500, and by it the appellant agreed that it would, at its own proper cost and expense, "furnish and erect at the lower gas works, in the city of Richmond, as set forth in the accompanying specifications and proposal, which shall be considered a part of this contract, the following articles: One (1) eleven (11 ′) foot carburetted water gas generating set, in accordance with the specifications of the city of Richmond, excepting certain changes in the specifications which need not be here mentioned. The specifications made a part of the contract, amongst other things, provided:

"The contractor must furnish all material and labor necessary to construct this set and to make all necessary connections to existing apparatus, so as to make a complete and operative installation and demonstrate its proper operation in connection with the existing apparatus.

"The drawings submitted herewith will serve to show the general arrangement of existing and proposed ap-

paratus, but it will be necessary for the contractor to examine the local conditions and make all measurements necessary to provide the proper piping and other material for the completion of the work."

The specifications further provided that "the contractor shall co-operate with other contractors engaged in construction work in order that there may be the least possible delay to such construction and no interference with the operation of the plant;" that it was essential "that all work be done with the least possible interference with the routine operation of the gas plant;" that "the contractor must make all connections to existing piping for the supply of water for the operation of the set and also wastes and drains. He must furnish and install all necessary pipe, fittings, supports and valves;" that "the contractor must make connection to the existing lines and install all pipe, fittings and valves necessary to operate pump and supply oil to the spray in the carburetter;" that the contractor should make proper provisions for connection with and operation of the "waste heat boiler;" that all machinery and apparatus should be given one coat of paint before shipment and another after completion; that pipe insulation should be painted with lead and oil and also all insulated pipe; that all hangers, brackets, etc., should be painted with a good coat of black asphaltum; and that "it is the intent of these specifications that the contractor shall do everything which may be necessary to furnish, erect and connect the generating set with all auxiliary equipment, complete, in accordance with the best American practice of the day, except that the purchaser will furnish foundations and blowers."

It seems plain from the foregoing facts that the object of the city of Richmond was to acquire, and of the appellant to furnish, a substantial addition, in completed

form, to the gas plant of the city, and not to purchase articles of personal property to be transported in interstate commerce. This is rendered still plainer by the other contract, the consideration for which was $6,432, which, for convenience, we designate as contract No. 2. The entire obligation imposed on the appellant by this contract was that the appellant, "at his own proper cost and expense, will furnish and erect at the lower gas works, in the city of Richmond, as set forth in the accompanying specifications and proposal which shall be considered a part of this contract, the following articles: Gas connections between Nos. 5 and 6 water gas generating sets and a waste heat boiler to be installed in accordance with drawing No. 6-165, and also a stack with hydraulic valve and steel platform and ladder, as set forth in specifications Nos. 8889 of the party of the first part." It further appears from the testimony that the appellant's plant would be complete without the connections mentioned and that the connections could have been made by other people. This work could only be done in the city of Richmond, and the contract bears no resemblance to a sale which is a transfer of personal property from one to another for a money consideration. It was a construction contract, and the use of personal property in its fulfilment was a mere incident.

A number of cases from other jurisdictions have been cited by counsel on both sides, but we shall not consider them nor undertake to reconcile their differences, if any such exist, as we regard the instant case as controlled by our own decisions and those of the Supreme Court of the United States.

In *Browning* v. *Waycross*, 233 U. S. 116, 34 Sup. Ct. 578, 58 L. Ed. 828, a Missouri corporation, through its agents in Georgia, solicited orders and made sales of

lightning rods, the price paid for the rods to the seller including the duty of erecting them without further cost. The agent of the seller was fined for violating an ordinance of the city of Waycross. It was claimed that the erection of the lightning rods was a mere incident of the sale and constituted a carrying on of interstate commerce which could not be taxed without violating the commerce clause of the Federal Constitution. In answer to this claim, Mr. Chief Justice White, delivering the unanimous opinion of the court, had this to say:

"We are of opinion that the court below was right in holding that the business of erecting lightning rods under the circumstances disclosed was within the regulating power of the State, and not the subject of interstate commerce, for the following reasons: (a) Because the affixing of lightning rods to houses was the carrying on of a business of a strictly local character, peculiarly within the exclusive control of State authority; (b) Because, besides, such business was wholly separate from interstate commerce, involved no question of the delivery of property shipped in interstate commerce, or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated. It is true that it was shown that the contract under which the rods were shipped bound the seller, at his own expense, to attach the rods to the houses of persons who ordered rods; but it was not within the power of the parties, by the form of their contract, to convert what was exclusively a local business, subject to State control, into an interstate commerce business, protected by the commerce clause. It is manifest that if the right here asserted were recognized, or the power to accomplish by contract what is here claimed were to be upheld, all lines of demarcation between National

and State authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one State to the other, and intended to be used after delivery in the construction of buildings or in the making of improvements in any form, would or could be made interstate commerce."

In the course of the opinion, the Chief Justice, "through abundance of precaution," added: "Of course, we are not called upon here to consider how far interstate commerce might be held to continue to apply to an article shipped from one State to another, after delivery and up to and including the time when the article was put together or made operative in the place of destination in a case where, because of some intrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction. In saying this we are not unmindful of the fact that some suggestion is here made that the putting up of the lightning rods after delivery by the agent of the seller was so vital and so essential as to render it impossible to contract without an agreement to that effect—a suggestion, however, which we deem it unnecessary to do more than mention in order to refute it."

The question under consideration was again brought under review in *General Railway Signal Co.* v. *Commonwealth*, 118 Va. 301, 87 S. E. 598, in which the court adopted the opinion of Prentis, Chairman of the State Corporation Commission, and which was affirmed by the Supreme Court of the United States in *General Railway Signal Co.* v. *Virginia*, 246 U. S. 500, 38 Sup. Ct. 360, 62 L. Ed. 854. The facts of this case were as follows:

"The defendant is a corporation of the State of New York, having an authorized capital of $5,000,000. Its

principal office and factory is at Rochester, N. Y., where it owns and operates a large manufacturing plant devoted to the manufacture of materials chiefly used in the construction of railway signals which it sells and constructs all over the world. It has a branch factory at Montreal, Canada, and maintains branch offices in New York City, Chicago and San Francisco.

"By contract dated the fifth day of May, 1914, with the Southern Railway Company, the defendant agreed to furnish certain materials, supplies, machinery, devices and equipment, as well as all necessary labor, and to install, erect, and put in place certain signals and apparatus shown on the plans and described in the specifications, from Amherst to Whittles, Virginia, fifty-eight miles, and to 'complete the entire system and turn same over to the railway company as a finished job, subject to inspection and acceptance, for $85,597. Similar contracts had been previously made and fully performed, one dated September 6, 1911, covering the lines of the Southern Railway in Virginia from Monroe to Montview, Virginia, thirteen miles, for $16,015, and one dated July 18, 1913, from Orange to Seminary, Virginia, seventy-six miles, for $112,428. The aggregate distance in this State covered by these contracts being 147 miles, and the total consideration being $214,040.

"The purpose of those signals is to promote safety of railway operation, and they operate automatically.

"In order to construct these signals as required by the contract, it was necessary to employ in this State labor, skilled and unskilled, to dig ditches in which conduits for the wires are placed, to construct concrete foundations, and to paint the completed structures. The completed structures are along the side of the railway track, about two miles apart, and are twenty-two or twenty-three feet high. In the language of

the witness, Moffett: 'It is necessary to erect the signal mechanism, the masts supporting the mechanism, the houses for protecting the relays, reactors, reactants and other similar electrical devices protected from the weather, then the transformers, high tension line arrestors and low tension line arrestors.' The completed structures are permanently attached to the freehold upon concrete bases."

Upon these facts it was held that the General Railway Signal Company was properly chargeable with a license tax for doing business in this State. The Supreme Court does not discuss the question, but, after reciting the facts, simply says: "We think the recited facts clearly show local business separate and distinct from interstate commerce within the doctrine announced and applied in *Browning* v. *Waycross*, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828."

But the opinion of the chairman of the State Corporation Commission, adopted by this court, contains an able discussion of the subject on both reason and authority, and is quite convincing in its conclusion. It would seem to be conclusive of the instant case, but for the interpretation which counsel for the appellant puts on the *Railway Signal Case,* and the distinction which is sought to be drawn between that case and the instant case.

The question again came under review in *York Manufacturing Co.* v. *Colley,* 247 U. S. 21, 38 Sup. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611. In that case the facts are stated in the opinion as follows: "The contract covered an ice plant guaranteed to produce three tons of ice a day, consisting of gas compression pumps, a compressor, ammonia condensers, freezing tank and cans, evaporating coils, brine agitator and other machinery and accessories,

including apparatus for utilizing exhaust steam for making distilled water for filling the ice cans. These parts of machinery, it was provided, were to be shipped from Pennsylvania to the point of delivery in Texas and were there to be erected and connected. This work, it was stipulated, was to be done under the supervision of an engineer to be sent by the York Manufacturing Company for whose services a fixed per diem charge of $6.00 was to be paid by the purchasers and who should have the assistance of mechanics furnished by the purchasers, the supervision to include not only the erection but the submitting of the machinery to a practical test in operation before the obligation to finally receive it would arise. It was moreover undisputed that these provisions were carried out; that about three weeks were consumed in erecting the machinery and about a week in practically testing it, when after a demonstration of its successful operation it was accepted by the purchasers."

It was held that the transaction was interstate commerce, and that the installation was a mere incident of the sale. It will be observed that there was a sale of definite specific personal property, and that the seller did nothing in Texas except to send an expert to Texas to supervise the setting up and testing in Texas of that which had been sold in Pennsylvania. It was mere installation, not construction of an additional kind. Counsel for the Western Gas Construction Company undertakes to distinguish the instant case from the *Waycross Case* and the *General Railway Signal Company Case*, and as to the latter says that the machinery was not of such complicated nature that it could not be set up by other experts, and hence the instant case comes within the holding of the *York Case*. Mr. Chief Justice White, who

delivered the opinion in the *York Case* makes no such distinctions as are claimed by counsel. Let him speak for himself. As to the *Waycross Case,* he says:

"In the first place the *Waycross Case* concerned merely the right of the city of Waycross to collect a charge against a person who was carrying on a business of erecting lightning rods as the agent of one who had sold the rods in another State and shipped them to Waycross under an agreement after their arrival to erect them. The case turned exclusively upon the nature and character of the business of erecting lightning rods and the relevant or appropriate relation to interstate commerce of a stipulation in an interstate contract of sale of such rods providing for their erection when delivery under the sale was made. As it was determined that the business of erecting lightning rods bore no relevant or appropriate relation to the contract made for the sale of such rods, it was decided that the contract for the erection of the rods did not lose its local character simply because it was made a part of an interstate commerce contract for the sale of the rods any more than would a contract for materials with which to build a house cause the building of the house to be a transaction of interstate commerce and not local business."

As to the *General Railway Signal Company Case,* he says: . "In that case the work required to be done by the contract over and above its inherent and intrinsic relation to the subject matter of the interstate commerce contract involved the performance of duties over which the State had a right to exercise control because of their inherent intrastate character. In fact the case last referred to, when looked at from a broad point of view, is but an illustration of the principle applied in the *Waycross Case* to the effect that that which was in-

herently intrastate did not lose its essential nature because it formed part of an interstate commerce contract to which it had no necessary relation."

The Chief Justice is also particular to confine his opinion to the facts of the particular case. He says: "Of course, we are concerned only with the case before us, that is, with a contract inherently relating to and intrinsically dealing with the thing sold, the machinery and all its parts constituting the ice plant."

First of all there must have been a sale of personal property, which had to be transported in interstate commerce, and if this was shown, then the seller had the right to set it up, or install it. But in the instant case, looking to the record as a whole, the contract was not for the sale of specific, definite personal property, simply to be transported and then set up, or installed in place, but a contract to furnish the materials and build an addition to the gas plant of the city of Richmond, according to designated plans and specifications, and to connect it up with the existing plant and other machinery being contemporarily installed. As well said by the commission:

"The essence of the undertaking of the Western Gas Construction Company was that of construction varying in degree rather than kind from other construction jobs, and in the view of the Commission the sale of the equipment and apparatus was an incident of the construction job rather than the construction a mere incident of the sale. The Western Gas Construction Company was the successful bidder, as far as the Richmond work was concerned, in an offer for bids by the city of Richmond for the furnishing of the materials and equipment for and the *construction* of certain portions of its gas plant, and it was *not* a necessary incident that the bidder should be the manufacturer and seller

of the generator system. This was a detail rather than a necessary feature of the bid. Therefore, the city of Richmond did not buy certain equipment and apparatus from the Western Gas Construction Company, but rather the Western Gas Construction Company was the successful bidder for the completion, according to certain specifications, of certain *construction* work at the lower Richmond gas works, involving the furnishing of equipment and apparatus, that would produce certain results and conform to certain specifications, and all other materials, all labor, and everything necessary to the completion of the construction."

The Western Gas Construction Company was an independent contractor on a "turnkey job." If such a transaction as is here in controversy should be held to be interstate commerce, then, as well said by Chief Justice White in the *Waycross Case*, "all lines of demarcation between national and State authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one State to another, and intended to be used in the construction of buildings, or in the making of improvements in any form, would or could be interstate commerce."

We have not made any special reference to the Winchester contract, because if the Western Gas Construction Company was doing business in this State under any of the contracts, it was liable to the license tax imposed by the statute, and, not having paid it, was subject to be fined.

We find no error in the holding of the State Corporation Commission, and its judgment is affirmed.

*Affirmed.*