# Richmond

## THE ATLANTIC REFINING COMPANY v. COMMONWEALTH OF VIRGINIA.

January 16, 1936.

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore* and *Lewis F. Powell, Jr.*, for the appellant.

*Abram P. Staples, Attorney-General*, and *W. W. Martin, Assistant Attorney-General*, and *C. M. Chichester*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

The petitioner, a non-resident commercial corporation, has been assessed with an entrance fee as a condition precedent to the privilege of doing domestic business in Virginia. This entrance fee it paid under protest and claims that the statute imposing it is unconstitutional. In proper proceedings relief was sought before the State Corporation Commission and refused. Hence, this appeal.

In the opinion of the Corporation Commission is a full and satisfactory statement of facts, which we might with confidence adopt as written, but for brevity we shall restate those matters which in our judgment are of major importance and upon which this case turns.

Necessarily, we look to conditions as they were when this fee was paid. If it was then a proper charge it is not invalidated by subsequent proceedings, nor can such proceedings make good that which was once void.

Indeed if this entrance fee had not been paid at the time of entry it might never be paid. Insolvency might inter-

vene. The petitioner might complete its work and withdraw before an assessment or levy could be made.

The Atlantic Refining Company is a Pennsylvania corporation and was chartered there in 1870. It refines petroleum and sells its products in forty-seven States, and in fourteen of them, Virginia now included, it maintains local stations for the sale of its own products and of automobile accessories.

On January 7, 1930, petitioner gave notice to the Commission of its intention to do a general business in Virginia without first paying any entrance fee, suggesting, however, that it be permitted to pay this fee under protest. On January 13, 1930, the Commission replied that the company was at liberty to adopt its own procedure, but that domestic business done in Virginia without payment of an entrance fee would be at its peril. Payment was made under protest on January 17, 1930, and on January 22, 1930, the desired permit issued.

This litigation was properly begun on April 26, 1930, by petition addressed to the State Corporation Commission. It concludes with this prayer:

"Wherefore, your petitioner prays that this Honorable Body may certify to the Comptroller of the State of Virginia that petitioner has paid into the State treasury an amount in excess of that required by law, to-wit: $5,000 on account of the entrance fee paid by the petitioner upon the granting of the certificate of authority to do business in the State of Virginia, and that the amount so paid may be refunded to petitioner, and that it may have all such other relief as to which it may be entitled."

Relief was refused.

Previous to the permit of January 22, 1930, this oil company had directly and indirectly for six years or more done an interstate business in Virginia. This the State did not undertake to hamper. It was not seeking permission to do something which it was already doing but permission to do something in addition, namely, to do directly and in its own name an intra-state business.

Mr. Serven, Assistant Comptroller in charge of domestic marketing, was asked and replied:

"Q. In other words, the primary purpose in handling gas and oil products in Virginia is to supply what we might call the local Virginia business?

"A. That is correct."

Before January 22, 1930, this Pennsylvania corporation had done directly an interstate business in its own name. It had done through the Red "C" Oil Company, a subsidiary Maryland corporation, which included the business of the Richmond Oil Company, an interstate and intra-state business, and it had done through the Atlantic Refining Company, a New York corporation, an intra-state business. Its volume in 1929 was:

"(1) Interstate business done by petitioner in its own name ..................$  363,534

"(2) Business done by Red "C" Oil Company, both interstate and intra-state, but principally intra-state ..........$  866,600

"(3) Business of Atlantic Refining Company, Inc., exclusively intra-state....$  166,466

"Total ....................$1,396,600"

This is its statement of its business on January 1, 1930:

"The only business in which petitioner was interested in the State of Virginia was the business, interstate and intra-state, of the Red "C" Oil Company and the interstate business conducted by petitioner in its own name; and the only property in Virginia in which petitioner was interested was the above described property belonging to Red "C" Oil Company having a value of approximately $262,580."

As of January 22, 1930, the total authorized capital of petitioner was $100,000,000. And there were outstanding shares having a par value of $67,049,500. As of January 1, 1930, its total invested capital was $132,196,275, and the volume of its business in 1929 was $153,530,041.

This is the statute in controversy, sec. 207 of the Tax Code of Virginia (Code 1930, appendix, p. 2185):

"Every foreign corporation, when it obtains from the State Corporation Commission a certificate of authority to do business in this State, shall pay an entrance fee into the treasury of Virginia to be ascertained and fixed as follows:

"For a company whose maximum capital stock is fifty thousand dollars or less, thirty dollars;

"For a company whose capital stock is over fifty thousand dollars and not to exceed one million dollars, sixty cents for each one thousand dollars or fraction thereof;

"Over one million dollars, and not to exceed ten million dollars, one thousand dollars;

"Over ten million dollars, and not to exceed twenty million dollars, one thousand, two hundred and fifty dollars;

"Over twenty million dollars, and not to exceed thirty million dollars, one thousand, five hundred dollars;

"Over thirty million dollars, and not to exceed forty million dollars, one thousand, seven hundred and fifty dollars;

"Over forty million dollars, and not to exceed fifty million dollars, two thousand dollars;

"Over fifty million dollars, and not to exceed sixty million dollars, two thousand, two hundred and fifty dollars;

"Over sixty million dollars, and not to exceed seventy million dollars, two thousand, five hundred dollars;

"Over seventy million dollars, and not to exceed eighty million dollars, two thousand, seven hundred and fifty dollars;

"Over eighty million dollars, and not to exceed ninety million dollars, three thousand dollars;

"Over ninety million dollars, five thousand dollars.

"But foreign corporations without capital stock shall pay fifty dollars only for such certificate of authority to do business in this State.

"For the purpose of this section the amount to which the company is authorized by the terms of its charter to

increase its capital stock shall be considered its maximum capital stock." (Tax bill, sec. 38a; 1910, p. 77).

This system of taxation has been in force in Virginia for more than thirty years. It has been twice assailed and twice sustained. *General Railway Signal Co.* v. *Commonwealth of Virginia,* 118 Va. 301, 87 S. E. 598, affirmed 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854, and *Western Gas Construction Co.* v. *Commonwealth of Virginia,* 147 Va. 235, 136 S. E. 646, 55 A. L. R. 717, affirmed 276 U. S. 597, 48 S. Ct. 319, 72 L. Ed. 723 (Mem.).

Charter fees for domestic corporations are assessed in substantially the same way, Tax Code, sec. 206 (Code 1930, appendix, p. 2185)—smaller it is true than those charged foreign corporations for doing a domestic business. As might be expected, the State favors its own instrumentalities.

"In subjecting a law of the State which imposes a charge upon foreign corporations to the test whether such a charge violates the equal protection clause of the Fourteenth Amendment, a line has to be drawn between the burden imposed by the State for the license or privilege to do business in the State and the tax burden which, having secured the right to do business, the foreign corporation must share with all the corporations and other taxpayers of the State. With respect to the admission fee, so to speak, which the foreign corporation must pay to become a quasi citizen of the State and entitled to equal privileges with citizens of the State, the measure of the burden is in the discretion of the State and any inequality as between the foreign corporation and the domestic corporation in that regard does not come within the inhibition of the Fourteenth Amendment; but after its admission the foreign corporation stands equal, and is to be classified with domestic corporations of the same kind." *Hanover Fire Insurance Co.* v. *Carr,* 272 U. S. 494, 47 S. Ct. 179, 183, 71 L. Ed. 372, 49 A. L. R. 713.

After admission every foreign corporation and every domestic corporation, so far as taxes are concerned, stand

upon a common footing. Tax Code, sec. 210 (Code 1930, appendix, p. 2186).

It is conceded that some charge in the nature of an entrance fee may be imposed. If this were not true domestic business would ultimately drift to foreign corporations. Why pay charter fees when they may be in this manner evaded?

If these fees are to be fixed by business thereafter done nothing may be collected. The corporation may become insolvent. It may finish its work and go. Doubtless these considerations influence the policy of the State, and it is not affected by the fact that other States may have followed different policies. Such considerations address themselves to the legislature. Moreover, some classification is reasonable. It can not be contended that the power to assess an income tax makes it necessary to assess all incomes ratably.

If all the paid-in capital of a corporation was engaged in interstate business, any assessment against that capital would be a charge on interstate commerce, and for a stronger reason that objection could be urged against an assessment levied against the volume of its business.

In the instant case this tax is not even levied against authorized capital. The tax against the Standard Oil Company of New Jersey, whose capital exceeds many times that of petitioner, is but $5,000. The authorized capital is not taxed but is used as a measure for taxation.

A State may arbitrarily refuse entrance to a foreign corporation, although it can not, as a condition for admission, impinge upon rights guaranteed by the Federal Constitution. *International Paper Co.* v. *Commonwealth of Massachusetts,* 246 U. S. 135, 38 S. Ct. 292, 62 L. Ed. 624, Ann. Cas. 1918C, 617; *Hanover Fire Insurance Co.* v. *Carr, supra.* ·

"The power of the State to impose upon a foreign corporation a license fee or tax as a condition precedent to its entry into the State is, from its nature, less subject to constitutional limitations than the power to impose a

franchise tax as payment or compensation for the privilege of continuing to do business here." *People* v. *Loughman,* 249 N. Y. 369, 164 N. E. 253, 255. Mr. Justice Cardozo was then a member of that court.

When a corporation has come into a State with its permission, has made investments and has built up a business, it has given hostages to fortune and can not then be told that it must submit to oppressive legislation or go.

Although it is not of major moment, we think the Commission was justified in finding that this corporation after it came could have no real difficulty in keeping separate accounts of its interstate and intra-state business.

If our statute imposes any direct burden upon interstate commerce, however small, it must fail, but it must in some form be a tax on property and not on privilege.

"It is settled that a State excise tax which affects such commerce, not directly, but only incidentally and remotely, may be entirely valid where it is clear that it is not imposed with the covert purpose or with the effect of defeating Federal constitutional rights. * * * The turning point of these decisions is whether in its incidence the tax affects interstate commerce so directly and immediately as to amount to a genuine and substantial regulation of, or restraint upon, it, or whether it affects it only incidentally or remotely, so that the tax is not in reality a burden, although in form it may touch and in fact distantly affect it." *Hump Hairpin Mfg. Co.* v. *Emmerson,* 258 U. S. 290, 42 S. Ct. 305, 307, 66 L. Ed. 622.

We have seen that it was sustained in *General Railway Signal Co.* v. *Virginia.* That case was argued on March 11, 1918, decided April 15, 1918, and is reported in 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854. It again came under review in *Western Gas Construction Co.* v. *Commonwealth of Virginia,* 276 U. S. 597, 48 S. Ct. 319, 72 L. Ed. 723, and was again sustained in a memorandum decision on authority of the *General Railway Signal Co. Case.* This was at the October term, 1927.

If these decisions have not been overruled, our investi-

gation is at an end, and if overruled, it must be by something since done. Certainly the court when they were handed down did not think that they were in conflict with principles previously approved.

It is not contended that this has been directly done, but it is contended that it has been done indirectly and by necessary inference. It is said that they follow *Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127, and that the principles there relied upon have since by that court been definitely disavowed. In support of this *Cudahy Packing Co.* v. *Hinkle,* 278 U. S. 460, 49 S. Ct. 204, 206, 73 L. Ed. 454, is in major measure relied upon.

██ In considering this claim these principles are to be remembered: Repeal by implication is not favored and statutes are not lightly held to be unconstitutional.

In 1916 the Cudahy Packing Company, a Main corporation, went into the State of Washington, and has since conducted there a "closely associated interstate and intrastate business." This entry was in all respects regular and met every statutory requirement. Its capital stock was then $20,000,000. By 1926 its authorization was increased to $45,000,000. It had acquired property worth $40,000, and its gross sales were $1,313,275. Less than one-half of it was intra-state. In 1925 that State by statute provided for a "filing fee," in principle quite like Virginia's "entrance fee." Its maximum limit was $3,000. An annual license fee with a $3,000 limitation was also imposed.

It was held that these charges were direct burdens upon interstate commerce and invalid.

The court said that unless saved by the $3,000 limitation the constitutional objections pointed out in *Looney* v. *Crane Co.,* 245 U. S. 178, 38 S. Ct. 85, 86, 62 L. Ed. 230, were in point and should be applied. It, therefore, becomes necessary to see what were the facts and to see what was done in this Texas case.

The *Looney Case* was first argued on May 3, 1916. It

was re-argued on November 6, 1917, and decided on December 10, 1917.

This, as we have seen, was but a short time before the *General Railway Signal Company Case* had been argued and decided.

In *Looney* v. *Crane Co., supra,* these facts appear: The Crane Company was an Illinois corporation. In 1905 it filed with the Secretary of State for Texas its articles of incorporation, paid a decennial tax for the privilege of doing business there, and continued to pay all charges assessed against it until that suit was instituted. The statute of 1889 required that a copy of the charter be filed and that there be paid for a permit to do business a minimum tax of $25, based upon $100,000 of capital stock. It provided also for an increase predicated upon capital stock until a maximum fee of $200 was reached.

In 1893 a franchise tax of $10 a year was levied on both domestic and foreign corporations. In 1897 this was changed as to domestic corporations, the minimum of $10 was retained and the maximum was raised to $50. As to foreign corporations the minimum was raised from $10 to $25 and the maximum limit was removed by fixing a percentage charge upon capital stock. By an act of 1907 "the surplus and undivided profits of the company became susceptible of being taken into view in addition to its authorized capital."

The authorized capital stock of the Crane Company was $17,000,000, paid up and issued. Its surplus and undivided profits was $8,139,000. Business done in Texas amounted to $1,019,750 for the year preceding the suit, divided about equally between State and interstate business, and at that time this company had invested there $301,197.

"In the same year in which the legislation was enacted providing for the taxation on the basis of surplus and undivided profits for the purpose of the franchise tax there was also enacted a law vastly increasing the amount of the permit tax. (Acts of 1907, S. S., p. 500; Revised

Statutes, 1911, art. 3837). We say vastly increasing because, although the standard for the levy of that tax, the authorized capital stock, was retained, 'the maximum limit which was $200 for ten years under the previous law was removed and the percentages of levy on the authorized capital stock were so augmented that the permit for which the company paid to the Secretary of State $200 for ten years in 1905 under the new law would have required the company to pay in order to do business in the State the sum of $17,040."

These taxes were held to be invalid.

This reference was made to the *Baltic Case* in *Cudahy Packing Co.* v. *Hinkle, supra:*

"*Baltic Mining Co.* v. *Massachusetts,* 231 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127, upheld a tax based upon authorized capital stock but limited to $2,000 imposed by Massachusetts upon foreign corporations for the privilege of doing local and domestic business therein. Consideration was given to the fact that the corporate assets were four times the authorized capital and to the limitation. Weighing all the circumstances; the court concluded that no direct substantial burden was imposed upon interstate commerce and that property beyond the State was not taxed."

*The Alpha Portland Cement Company* v. *Commonwealth of Massachusetts,* 268 U. S. 203, 45 S. Ct. 477, 69 L. Ed. 916, 44 A. L. R. 1219, is also cited as sustaining the proposition that any direct tax, however small, which burdens interstate commerce is invalid. It deals with an annual excise tax on a foreign corporation engaged solely in interstate commerce.

In conclusion the court said:

"Whether, because reckoned upon authorized and not upon actual capital stock, the challenged legislation fails to require like fees for equal privileges within the doctrine of *Air-Way Electric Appliance Corp.* v. *Day,* 266 U. S. 71, 45 S. Ct. 12, 69 L. Ed. 169, we need not now consider."

Here under review was not an entrance fee but an an-

nual franchise tax levied against a corporation already admitted and based upon the mere number of authorized shares of no par value stock.

These are all of the cases cited by the court in support of its conclusions.

They tell us that the amount of the tax is immaterial and that a maximum limit is not in itself necessarily the touchstone. To this extent the *Baltic Case* is definitely overruled.

We are told that with the maximum limit out of the way the principles of the *Looney Case* apply in the *Cudahy Case* and govern.

When the *General Railway Signal Company Case* was decided the *Looney Case* had already been argued, re-argued and decided. Plainly the court did not then look upon them as being in conflict. The *General Railway Signal Company Case* was near the border line but not over it, and to that effect the *Looney Case* was cited. In the *Cudahy Case* Mr. Justice Brandeis, dissenting, said: "The *General Railway Signal Company Case* was decided by a unanimous court and the correctness of the decision has never been questioned." This statement, if unwarranted, would have been met in the court's opinion.

An entrance fee is to be distinguished from charges thereafter made. It may be taken or left. When burdens are afterwards imposed, the State in substance says, you must acquiesce or forfeit a built-up business.

In the *Looney Case* the complaining company had been duly admitted, had paid all charges necessitated by admission, had made investments and had built up business. It was after this that additional invalid burdens were placed upon it.

When the Cudahy Company began business in the State of Washington no admission fee appears then to have been necessary or imposed. And it was not until many years later, after it, too, had made investments and built up business, that a "filing fee" and an "annual license fee" was called for.

As indicated, the narrow issue is this: Has the *Cudahy Case* overruled the *General Railway Signal Company Case* and the *Western Gas Construction Company Case?* The issue is too serious to warrant us in believing that the Supreme Court with an opportunity to express itself would have been content to do this by inference only.

We have not undertaken to review the cloud of cases brought to our attention. "They beat down the mind and cloud with dust the vision." The opinion of the Commission alone covers one hundred and forty-seven printed pages.

█ For reasons stated, we are of opinion that the judgment of the State Corporation Commission should be affirmed, and it is so ordered.

*Affirmed.*