# Richmond

JAMES D. JOHNSTON, RECEIVER OF GILLIAM-PADGETT COMPANY, INC. v. THE LAMSON COMPANY, INC.

January 12, 1933.

Present, Holt, Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*James D. Johnston,* for the plaintiff in error.

*Woods, Chitwood, Coxe & Rogers,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The Lamson Company, Incorporated, is a Massachusetts corporation, with its principal office in Syracuse, New York. It operates under its letters patent and manufactures and installs a cash carrier system, which is known as the Lamson Preferred Cable Cash Carrier System. It entered into a contract on August 17, 1927, with the R. B. Bass Company, Incorporated, a Virginia corporation, engaged in conducting and operating its department store in the city of Roanoke, Va., to furnish and install in the store one of its systems to contain eleven stations and thirty-three cash boxes. It was agreed to be installed in accordance with a certain submitted plan, designated by a number, and dated August 4, 1927, and the Lamson Company also agreed to furnish without charge all parts necessary to keep the system in proper repair, with certain exceptions not needful to be mentioned.

The agreement was to be for a period of ten years from the date of the installation and to continue from year to year unless either party should notify the other in writing

sixty days before the expiration of the original term, or any extension thereof, of its desire to terminate the agreement. The Bass Company agreed to pay quarterly in advance the sum of $108.00 for the cost of installing or continuing the system, for the license to use it under the letters patent, for the agreement to supply parts for repairs and for the right to operate it in the designated premises during the term.

It was also agreed that the user could not assign or under-let the system without the previous consent in writing of the owner, the Lamson Company, and further that if the business of the user passed into the hands of a receiver, or if it discontinued business in the designated premises, all unpaid amounts to the end of the agreement, without notice or demand by the owner, would at once be precipitated and become due and payable, and the owner might enter the premises and take possession of and remove the system and that the user's interest thereon would be valued at a sum equal to twenty per cent of the amount of the payments for the unexpired term, which sum would be deducted from the user's obligation under the contract. The contract was accepted by the Lamson Company at Syracuse, New York, on August 17, 1927.

There were also stipulations in the contract that at end of the term the system was to be returned to the owner unless in the meantime it should be purchased by the user upon terms stated. The above recitals are in *epitome* the germane provisions of the agreement.

On the 5th of November, 1928, the name of the "R. B. Bass Company, Incorporated," was changed to Gilliam-Padgett Company, Incorporated. This was accomplished by the appropriate legal steps. It was caused by the retirement of Mr. Bass and the coming into the latter concern of Messrs. Gilliam and Padgett. The Gilliam-Padgett Company, Incorporated, with the written consent of the Lamson Company, entered into a written agreement, dated April 23, 1929, with the Bass Company by which it became the

assignee of all the latter company's right, title and interest in the cash carrier system and it agreed to perform all of the covenants and stipulations embodied in the agreement between the owner thereof and the original user.

Subsequently a creditor's suit was instituted against the Gilliam-Padgett Company, Incorporated, and by a decree entered therein, on May 23, 1929, Colonel James D. Johnston was appointed receiver for the company. The receiver took over the business and operated it until September 7, 1929, when he sold it to Mr. Frank Hirsh. Hirsh discontinued the business on February 8, 1930, and vacated the store premises, of which he notified the Lamson Company.

. Upon assuming the duties of the receivership there ensued a correspondence between the receiver and the Lamson Company relative to the cash carrier system, and as the alleged effect of these communications, by letters, form the basis of one of the defenses of the receiver to the claim of the company, their contents will be noted with particularity.

For clarity the appellant will hereafter be referred to as the receiver and the appellee as the company.

. The first letter of the receiver to the company dated May 27, 1929, was a circular letter to the creditors of Gilliam-Padgett Company, Incorporated, informing them of the fact of the receivership, the financial condition of the debtor, and that in thirty days or less a substantial payment on the indebtedness might be expected. On June 3, 1929, the receiver wrote the company enclosing his check as receiver for $108.00 to cover the rent for the carrier system to September 1, 1929. He added that, as receiver, he desired to continue the rental and would pay for same during the time it was used, and that the company would be advised of the future of the Gilliam-Padgett Company which at that writing was uncertain.

The next letter of importance was dated October 3, 1929, in which the receiver acknowledged receipt of the company's bill for rental of the system from September 1 to December 1, 1929, of $108.00, and further said that on September 6th

he had sold the stock of goods and fixtures to Frank Hirsh who took possession on September 7th and that he (Hirsh) would pay ratably for the rental of the syjstem, but if the company would send him a statement of the charges therefor, for six days in September, he would send his check for same, and that after September 6th the rental should be billed to Frank Hirsh. On October 7th the company wrote the receiver billing him for $7.20 to cover the rental for six days and noted the contents of the receiver's previous letter to the effect that thereafter the rentals should be billed to Mr. Hirsh, and stated that his letter would be referred to its leasing department.

On October 9th the receiver enclosed his check for the $7.20 and closed his letter with this paragraph: "As indicated in my previous letter, I have disposed of the stock and will expect you to deal direct with Mr. Frank Hirsh for your system."

On November 11, 1929, the company received a letter from John Hirsh, dated November 9th, on the letter head of Gilliam-Padgett Company, Incorporated, as follows: "Enclosed you will find check for $100.80 covering statement of November 1, 1929, for Gilliam-Padgett Company, Incorporated, for the rental of carrier system from October 7th to December 1st."

On November 15, 1929, the company wrote the receiver a letter caling his attention to the terms of the lease and the assignment by the Bass Company to Gilliam-Padgett Company and particularly to the provision accelerating the rental to its expiration in the event of breaching the contract. The company asserted its right to make claim against the Gilliam-Padgett Company in accordance with the terms of the contract. The receiver replied by saying in effect that the matter would have to be determined by the court and asked to be advised as to the total amount of the company's claim. The company replied, insisting upon the validity of its claim and enclosed a statement of the amount which was $2,707.20, which was arrived at by deducting

from the total amount of the installments for the ten year period, all payments thereon, by whomsoever made, and twenty per cent of the balance on account of the user's interest provided for in the contract. The receiver on November 23rd wrote the company that he did not think its claim could be maintained and that by delivering the possession of the system and failing to comply with the statute laws of Virginia it had lost all its rights as against the creditors of the Gilliam-Padgett Company and that he, the receiver, was at that writing notifying Mr. John Hirsh, the then user of the system to withhold the payment of any further rentals until the court could pass upon the validity of the contract. On January 24, 1930, the receiver finally declined payment of the company's bill giving his reasons therefor, which were, that there had been a novation of the debt or claim of the company by its substitution of Hirsh for the Gilliam-Padgett Company, as the user, by its acceptance from him of payments of the rentals and that a new agreement had been, in fact, made between him (the receiver) and the company because he had notified the company that he desired to continue the rental and would pay for the same during the time it (the system) was used, in which the company had acquiesced by accepting rental installments from him. He also contended that he had terminated the agreement by his letters, already referred to, and that the company had lost its rights by its failure to comply with the statute laws of Virginia with respect to the recordation of conditional sales contracts. There were other letters of the same general character which, we think, need no further reference.

The company filed, by leave of court, its petition, in the creditors suit referred to, setting forth its case substantially as has been detailed, based upon the agreement, the assignment, and the letters, asking leave to sue the receiver at law and to have its petition treated as a notice of motion for judgment and be transferred to the law side of the court. Process was issued on this petition in August, 1930. The

receiver, failing to answer, the prayer of the petition was granted on November 5, 1930, at which time, at the instance of the receiver, the company being a non-resident, was required to give bond for any costs and damages which might be awarded against it. The receiver demurred to the petition upon the grounds already disclosed and filed pleas of *nil debet* and *non est factum* and gave notice that he would ask the court to dismiss the petition for the reason that the company had not complied with section 3847 of the Code, requiring foreign corporations doing business in this State to be domesticated and therefore it was subject to the penalties prescribed by section 3848, one of which is that such foreign corporations shall not recover any money or property or enforce any contract in any court until the laws providing for domestication have been complied with.

The court overruled the receiver's demurrer to the petition. The receiver then filed a plea setting forth more fully the defense of the company's non-compliance with the domestication statute and alleging that the company had been and was doing business with other companies, concerns and firms in the State of Virginia, naming some of them, and stating that he had a right, under the law, to call the company or its officers and agents, as adverse witnesses, and examine them relative thereto. He also amended his grounds of defense by the allegation that the repossession of the system by the company constituted a failure of consideration for the contract in that it was no longer subject to further use under the contract, as where a tenant vacates a house and the landlord repossesses. He also made his amended grounds of defense conform to the substance of his plea.

The grounds of defense were struck out by the court on motion. The company demurred to the receiver's motion to dismiss the petition and to the plea last referred to, which demurrers were sustained and the court's final decree was in part as follows: "Thereupon the plaintiff duly proved the contract and letters set out in its petition, which has

heretofore been ordered treated as a motion for judgment. The defendant offering no evidence except that the board of directors of R. B. Bass & Company, Incorporated (subsequently Gilliam-Padgett Company, Incorporated) had not formally either authorized or ratified said contract and it appearing to the court that no issue of fact is involved and that said contract and correspondence have heretofore been construed by the court in passing upon the demurrer of the defendant, it is accordingly ordered that the plaintiff do have and recover of the defendant the sum of $2,707.20, with interest thereon from the 23rd day of May, 1929, and its costs in this behalf expended, to which action the defendant excepted."

■ The defense founded upon non-compliance on the part of the company with the statute relating to conditional sales contracts was not insisted upon, hence we shall say nothing more upon that point than that it is not applicable to this case.

■■ As to the defense of the failure of consideration we here quote from the opinion in the case of *Lamson Co.* v.. *Elliott-Taylor-Woolfenden Co.* (C. C. A.) 25 Fed. (2d.) 4, 6, 7, 58 A. L. R. 295, which is apposite and quite effectually disposes of this contention: "It is the theory of a real estate lease that the continuing possession is the consideration for the continuing rent, and so the right to collect future rentals, after termination of the lease and re-entry, has been denied, because there remained no consideration for the future promises. It is not characteristic of a real estate lease that the lessor at the making distinctly parts with a consideration separate from possession and which is to be repaid to him only gradually by rent installments spread over the whole period; and, if such a situation does exist, as where he makes special alterations and improvements which are useless to him on re-entry, it is not clear why he may not both re-enter and recover the damages therefor.

"The contract in this case carefully specifies considerations which might not be completely made good to the owner until the last quarterly payment is received. These are (a) the cost of installing; (b) the license to use under patents; (c) the free supply of parts for repairs; and then (d) generally, the right to operate the system. For all of these things the user agrees to pay a total sum, divided into installment payments. We may well assume that the original cost of making the sale of such a system and system rights, and also the cost of installation, may be large. The value of the granted patent licenses is indefinite, and the extent of such existing licenses has an effect upon the value of the patents themselves. The obligation to furnish repair parts must be made good by the present and continuing maintenance of a stock of repairs. In addition, it appears without dispute in this case (as the court in the *Miller Case* [(C. C. A.) 219 Fed. 851, L. R. A. 1916B, 1099, Ann. Cas. 1916A, 946] for lack of convincing proofs was unwilling to assume), that the system, for the purpose of tearing out of the building and restoring to the owner, is worthless. If parts are removed with such care that they can be used elsewhere, it costs more to pay the necessary skilled labor therefor and for refinishing them than it would to make new parts; and, if the parts are torn out cheaply and carelessly, they are junk, worth less than even that removal cost. Hence it seems probable enough, if not certain, that a provision for precipitating future payments, even after reclamation, is necessary for the protection of the owner. Of course, it may work hardship to the user and excess profit to the owner in some cases, but that does not make it so generally arbitrary and in the nature of a mere forfeiture as to destroy its validity.

"In another respect the analogy to a lease of real estate fails. The lessor has a single piece of real estate. He cannot multiply it. With reference to a manufactured article, he may make as many as he can find customers for. If on retaking an article once placed he sells it to another, he there-

by destroys his outlet for a new sale with full profits. This feature is important also in deciding whether the recovery of the future payments, after reclamation, is so unreasonable as to indicate a penalty, rather than a rightly stipulated damage.

"Another distinguishing feature from the *Miller Case* is that this contract recognizes and stipulates the value of the credit which the user ought to have in case of reclamation. It does this under the name of the value of the user's interest, and, though this seems an inappropriate name, this credit will serve as well to represent the agreed value to the owner of the property he gets back and of the maintenance burden he escapes.

█ "Upon this record we see no reason why this contract, considered broadly as one which expressly permits both a retaking for the user's default, and a precipitation and collection of the future payments, should be condemned as necessarily invalid because involving a penalty or forfeiture. A material part of the distributed investment cost had not been repaid, and was not recovered by the retaking; the property retaken is of little if any value to the owner; a presumptively fair allowance is made to the user to cover reasonable values or savings secured to the owner by the retaking, and the owner is entitled to separate, full profits from as many systems as he can place. When competent parties, dealing as strangers, have provided for stated damages on default, and the damages are made proportionate to the extent of the default, and probably approximate the actual damages, no reason is seen for defeating that contract."

The receiver urges that there were two events in the case in judgment which effected a novation in each instance. First, that the transaction between himself and the company constituted a new contract between them which was a substitution for the original contract between the Gilliam-Padgett Company and the Lamson Company, and, second, that the company's dealings with Hirsh effected a new con-

tract with him with a similar result as to him. With this contention we are not in accord. It is not sustained by reason or authority.

In the case of *Chenoweth* v. *National Bldg. Ass'n,* 59 W. Va. 653, 53 S. E. 559, 561, quoting from authorities, it is said: " 'Novation requires the creation of new contractual relations, as well as the extinguishment of old. There must be a consent of all the parties to a substitution, resulting in the extinguishment of the old obligation and the creation of a valid new one.' (Citing authorities.) 'The original agreement of which novation is sought must be absolutely extinguished, and the new agreement substituted for it.' * * * 'A novation is never presumed, but must be established by the full discharge of the original debt by the express terms of the agreement or the acts of the parties, whose intention must be clear.' "

"To constitute a novation, the creation of new contractual relations is required, as well as the extinguishment of the old. The burden was on the defendant to prove the establishment of new contractual relations between plaintiff and Euksuzian, as well as the extinguishment of the relations between plaintiff and defendant. Without discussing the evidence in detail, it is sufficient to say that the proof does not measure up to the required standard." *Linbrook Realty Corp.* v. *Rogers,* 158 Va. 181, 163 S. E. 346, 348.

"Whether a new security shall be taken to be a novation, or substitution for, and an extinguishment of, a prior indebtedness, is a matter of intention; and the burden rests upon him who asserts that there has been such novation to establish it." *State Bank* v. *Domestic, etc., Co.,* 99 Va. 411, 418, 39 S. E. 141, 143, 86 Am. St. Rep. 891.

"In the absence of satisfactory proof to the contrary, the presumption is that the debt has not been extinguished by taking the new evidence of indebtedness; * * *" *Fidelity Loan & Trust Co.* v. *Engleby,* 99 Va. 168, 171, 37 S. E. 957, 958.

In the above cases new securities were taken and this court held that they did not constitute a novation of the originals; that whether there was a novation or not depended upon the intention of the parties affected. In the immediate case there is nothing in the record that leads us to the conclusion that it was the intention of the Lamson Company or of Hirsh that the engagements of the receiver or Hirsh as to the rentals should effect a novation of the company's claim against the Gilliam-Padgett Company.

In 20 R. C. L. 367 is the following: "It is essential then, in order to constitute a novation, by which the original debtor is released, the creditor being bound thereby to discharge the debt as to him and look to another for the payment of his demand, that a contract be made between the new debtor and the creditor by which the claim can be enforced against such new debtor, and if the new debtor enters into no contract with the creditor by which he becomes the debtor of the creditor, so that the creditor may maintain an action against him, there is not a novation."

It was the receiver's duty to pay *pro rata* rent for the system for the period of its use and occupation by him at a reasonable value. The fact that he did this together with his letters to the company and its replies did not establish a contract which is essential. This applies also to the Hirsh transaction.

To the contention that it was obligatory upon the company to become domesticated by complying with the Virginia statute relative thereto, and not having done so, it was amenable to the statutory penalties and inhibitions, the company replied that the transaction concerned was one involving interstate commerce, which under the Federal Constitution (article 1, section 8, subdivision 3), may not be burdened or hampered by the provisions of a State statute which has that effect. It maintained that the performance of its agreement or contract in the present case did not offend the statute because it was not doing the character of business in this State which was subject to State control.

The paramount question, then, for our determination is, Was the precise transaction under review an act of trade in interstate or intrastate commerce?

It will be noted that the precise business was that of *leasing* the system. As most of the decided cases have to do with the *sale* of the article in commerce let us see whether in the eyes of the law they stand upon the same footing with respect to trade or commerce.

In the case of *United States* v. *United Shoe Machinery Co.*, 234 Fed. 127, 143, the United States District Court for the Eastern District of Missouri said: "Counsel for defendants challenge the constitutionality of so much of section 3 of the Clayton act [15 U. S. C. A. Section 14] as applies to leases. It has been earnestly and ably argued that a lease is no more commerce than insurance or manufacturing, and it is claimed, if not commerce, it cannot be interstate commerce. The diligence of the able counsel has not been rewarded by finding any authority which has determined that question, nor has the court been able to find any."

The court in the case cited then quotes from the case of *Butler Bros. Shoe Co.* v. *United States Rubber Co.*, 156 Fed. 1, 17, 84 C. C. A. 167, 183: "Nor is the fact that these contracts did not evidence sales of the goods determinative of this question. A sale is not the test of interstate commerce. All sales of sound articles of commerce, which necessitate the transportation of the goods sold from one State to another, are interstate commerce; but all interstate commerce is not sales of goods. Importation into one State from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different States, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce."

And in holding that the leases of shoe machinery were interstate commerce, the court in *United States* v. *United Shoe Machinery Co., supra,* said: "It is not necessary to

cite the many authorities found in the books sustaining this conclusion, as they will be found collated in the opinions hereinbefore cited. It is sufficient to say that as new methods of transacting business are devised, if they are found to be in effect methods of carrying on commerce in any business, and the means for commercial transactions between the owner of the article on the one hand, and the person who wants to deal in it or use it in carrying on his business on the other hand, whether it be manufacturing, selling, trading, leasing, transportation, communication, or information, and it is sent or transported from one State to another, it is interstate commerce, and therefore, subject to be regulated by Congress under the commerce clause of the Constitution."

In the case of *Binderup* v. *Pathe Exchange*, 263 U. S. 291, 44 S. Ct. 96, 99, 68 L. Ed. 308, the United States Supreme Court said through Mr. Justice Sutherland: "The film contracts were between residents of different States, and contemplated the leasing by one to the other of a commodity manufactured in one State and transported and to be transported to and used in another. The business of the distributors, of which the arrangement with the exhibitor here was an instance, was clearly interstate. It consisted of manufacturing the commodity in one State, finding customers for it in other States, making contracts of lease with them, and transporting the commodity leased from the State of manufacture into the States of the lessees.

\* \* \* \* \* \* \* \* \*

"The contracts with these distributors contemplated and provided for transactions in interstate commerce. The business which was done under them—leasing, transportation, and delivery of films—was interstate commerce."

We think that it is plain that leases may be the subject of interstate commerce.

Now let us consider the main question as denoted above. Two cases passing upon the question of whether the transactions involved in them were interstate or intrastate com-

merce have been decided by this court. They are *General Ry. Signal Co.* v. *Commonwealth*, 118 Va. 301, 87 S. E. 598, 600, in which the opinion of Judge Prentis, then Chairman of the Virginia Corporation Commission, later Chief Justice of this court, was adopted as the opinion of the court, and *Western Gas Co.* v. *Commonwealth*, 147 Va. 235, 136 S. E. 646, 649, 55 A. L. R. 717. The one is rather a prototype of the other. The subject of the former was a contract to furnish materials, supplies, machinery, devices and equipment, as well as all necessary labor, and to install, erect, and put in place certain signals and apparatus shown on plans and described in specifications, to the Southern Railway Company, from Amherst to Whittles, Virginia, fifty-eight miles, and to complete the entire system and turn same over to the railway company as a finished job, subject to inspection and acceptance, for $85,597.00. It was necessary to employ in this State labor, skilled and unskilled, to dig ditches for conduits, to construct concrete foundations and to paint the completed structures. This work required many months. This court held that the Signal Company, which was a foreign corporation, with its principal office in New York, and which manufactured the materials used in the construction of the signals, was doing business in this State and therefore subject to the provisions of the statute governing domestication. The theory was that the object of the Southern Railway Company was to secure the erection of permanent structures upon its right of way, and not the purchase of goods to be transported in interstate commerce. That such permanent structures became a part of the property located in Virginia owned by the railway company and liable to State taxation and no longer protected by the commerce clause of the Constitution. This decision was upheld by the United States Supreme Court. (*General Ry. Signal Co.* v. *Commonwealth*), 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854. This court, however, said: "There are other cases relied upon by the defendant's (railway company's) counsel in which there was only a single transaction

where it was held, *and it is established,* that the foreign corporation may follow its goods into the other States to which they have been transported in interstate commerce, and may there do incidental acts of installation so that the goods may be used for their designed purpose." (Parenthesis and italics added.)

There was a similar holding in the latter case where the subject of the contract was for the sale, assembling, installation and erection of certain gas machines for and in the city of Richmond. The equipment was manufactured and partly assembled in Fort Wayne, Indiana, by the foreign corporation. The work in Richmond began on the 28th of July, 1925, and was completed on November 1, 1925, three months and more, and a vast amount of work had to be done locally by a number of local laborers and also by skilled and experienced workmen supervised by an expert and three assistants from the foreign company's home office. The Virginia Commission denominated it a "construction job," and this court said through Judge Burks: "It was a construction contract, and the use of personal property in its fulfillment was a mere incident."

So it is that the two cases cited concerned transactions of an entirely different character from that in the case in judgment. The distinguishing characteristics emphasize a different result effected by the facts which obtain in the present case which was announced in the quotation from the *Railway Signal Case.*

In the opinion in the *Western Gas Co. Case, supra,* is cited an important case which went up to the Supreme Court of the United States from the State of Texas and is frequently referred to as the *York Case* in which Chief Justice White delivered the opinion. This court said at page 247 of 147 Va., 136 S. E. 646, 650: "The question again came under review in *York Manufacturing Co.* v. *Colley,* 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611. In that case the facts are stated in the opinion as follows: 'The contract covered an ice plant guaranteed to produce three

tons of ice a day, consisting of gas compression pumps, a compressor, ammonia condensers, freezing tank and cans, evaporating coils, brine agitator and other machinery and accessories, including apparatus for utilizing exhaust steam for making distilled water for filling the ice cans. These parts of machinery, it was provided, were to be shipped from Pennsylvania to the point of delivery in Texas and were there to be erected and connected. This work, it was stipulated, was to be done under the supervision of an engineer to be sent by the York Manufacturing Company for whose services a fixed per diem charge of $6.00 was to be paid by the purchasers and who should have the assistance of mechanics furnished by the purchasers, the supervision to include not only the erection but the submitting of the machinery to a practical test in operation before the obligation to finally receive it would arise. It was moreover undisputed that these provisions were carried out; that about three weeks were consumed in erecting the machinery and about a week in practically testing it, when after a demonstration of its successful operation it was accepted by the purchasers.'

"It was held that the transaction was interstate commerce, and that the installation was a mere incident of the sale. It will be observed that there was a sale of definite specific personal property, and that the seller did nothing in Texas except to send an expert to Texas to supervise the setting up and testing in Texas of that which had been sold in Pennsylvania."

We quote from the annotator's note to the *York Case, supra,* found in 11 A. L. R. 617, 618, the following excerpts: "The mere installation of a furnace sold in another State is not doing business within the State, so as to require compliance with the State laws to enable the seller to enforce the contract. *J. L. White Furnace Co. v. C. W. Miller Transfer Co.* (1909) 131 App. Div. 559, 115 N. Y. S. 625.

"A contract by a foreign corporation to sell a grain dryer and cooler, and install it in the buyer's building, involves

interstate commerce, and may be performed and enforced without complying with the local laws entitling foreign corporations to do business within the State. *Hess Warming & Ventilating Co.* v. *Burlington Grain Elevator Co.* (1919) 280 Mo. 163, 217 S. W. 493, * * *

"The fact that a water tank and tower manufactured by a corporation in one State, for use in another, is to be set up by defendant in the latter, does not take the contract out of the protection of the commerce clause of the Federal Constitution, so as to deprive the seller of a lien for work because it has not complied with the local statutes. *Flint & W. Mfg. Co.* v. *McDonald* (1908) 21 S. D. 526, 114 N. W. 684, 14 L. R. A. (N. S.) 673, 130 Am. St. Rep. 735. * * *

"The sale of a soda fountain transported *membris disjectis,* and set up or installed by the vendor, a foreign corporation, was a transaction not robbed of its interstate character by the installation, as that was a mere incident of the sale. *Puffer Mfg. Co.* v. *Kelly* (1916) 198 Ala. 131, 73 So. 403. In this connection it was said: 'If there is a sale of a chattel, complete in the hands of the vendor, although it may, from convenience or necessity, be transported *membris disjectis,* an agreement to merely set it up ready for use in the vendee's place of business is, upon its face, but an incident of the sale, which ought not to destroy its character as a single and indivisible act of interstate commerce.' "

There are authorities *contra* to those cited here but the decided weight of judicial pronouncement impels us to the decision that the Lamson Company, the appellee, in the present case was engaged in interstate commerce in the transaction involved and so it was not subject to our domestication statutes.

The company with the consent of the receiver repossessed the system and salvaged it realizing the comparatively insignificant sum of $52.44 and in view of this fact it might be suggested that the dominant feature of the particular transaction was the installation, but we cannot say this in

the face of the fact that this system was especially designed for the particular premises in which it was operated, a circumstance which would presumably affect its resale value. Again the expressed consideration in the contract was "for the cost of installing or continuing this Lamson system, for the license to use it under the owners letters patent, for the agreement to supply parts for repairs, and for the right to operate this system in these premises during the term of this agreement." As was said in the *Elliott-Taylor-Woolfenden Case, supra,* in speaking of the values represented as not regained by repossession of one of these very systems: "A material part of the distributed investment cost had not been repaid, and was not recovered by the retaking; * * * and the owner is entitled to separate, full profits from as many systems as he can place." When all these elements of consideration in the one case and of deprivation in the other enter into the matter it would be a leap in the dark to choose one as the dominant feature.

There remains only one point of defense for consideration. The receiver urges that he was denied the right to elicit evidence and have his rights determined by a jury. It seems to us that the case was as completely and fully presented by the various pleadings before the court as it could have been before another tribunal and if upon the same state of facts before a jury there had been a verdict for the defendant, the court would have been compelled to set it aside. The controlling questions were ones of law.

The defendant interposed a demurrer to the petition which admitted the truth of all the facts stated therein which were well pleaded. The demurrer was overruled and then the defendant filed a special plea, grounds of defense, a motion to dismiss the petition with specifications thereunder, and amended grounds of defense. He withdrew his plea of *non est factum.* The court sustained the motion to strike out his grounds of defense and sustained the company's demurrer to his plea which raised the main issue and the court in its final decree said that the defend-

ant offered no evidence except that the board of directors of Bass & Company (subsequently Gilliam-Padgett Company, Incorporated) had not formally authorized or ratified the contract. The court added that there was no issue of fact involved and consequently gave judgment for the plaintiff (the company). We find no error in the rulings of the trial court and its judgment is sustained, with this amendment, that it be entered against the receiver in his official capacity and not as an individual.

*Amended and affirmed.*