No. 25,885.

KAW BOILER WORKS COMPANY, *Appellee,* v. INTERSTATE REFINERIES,
*Appellant.*

SYLLABUS BY THE COURT.

1. CORPORATIONS—*Foreign—Acts Appropriate to Interstate Sale.* Where the
   plaintiff, a Kansas corporation, having its principal place of business and
   manufacturing plant in Kansas City, Kan., there entered into certain con-
   tracts with the defendant to furnish the equipment for the erection of an
   oil-cracking refinery in Kansas City, Mo., and where the defendant declined
   to pay for the equipment because plaintiff was not authorized, under the
   statutes, to do business in Missouri: *Held,* (a) A provision that the plain-
   tiff should assemble and erect the machinery in question at the point of
   destination and test it was relevant and appropriate to an interstate sale;
   (b) The attachment of parts of the machinery at defendant's plant in Mis-
   souri by the plaintiff under the circumstances stated in the opinion was rele-
   vant and appropriate to an interstate sale.

2. SAME—*Consideration Generally.* Various assignments of error considered
   and held not to be of substantial merit.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCH-
INGS, judge. Opinion filed June 6, 1925. Affirmed.

*O. J. Stanley,* of Kansas City, *J. M. Johnson,* and *C. O. French,* both of
Kansas City, Mo., for the appellant.

*Edwin S. McAnany, Maurice L. Alden, Thos. M. VanCleave,* all of Kansas
City, and *Clyde Taylor,* of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover a balance of the
purchase price of certain oil-refinery equipment. The plaintiff pre-
vailed, and defendant appeals.

The plaintiff is a Kansas corporation having its principal place
of business in Kansas City, Kan. The defendant is a Delaware
corporation engaged in the oil business, with its principal office in
Kansas City, Mo. Certain contracts were entered into between the
parties, whereby the plaintiff furnished to defendant the equip-
ment for the erection of an oil-cracking refinery at its plant in
Kansas City, Mo. The defendant declined to pay for the equip-
ment, chiefly because plaintiff was not authorized under the stat-
ute to do business in Missouri. Trial was to a jury. Verdict for
plaintiff for $29,915.71, and special findings as follows:

"Q. 1. Were written proposals submitted by the plaintiff Kaw Boiler Works to defendant Interstate Refineries in Kansas City, Missouri, for furnishing to defendant the preheaters, pressure stills, dephlegmating towers and storage tanks involved in this lawsuit. A. Yes.

"Q. 3. Did the contract between plaintiff and defendant require the plaintiff to construct or erect the three tanks at defendant's refinery in Kansas City, Missouri? A. Yes.

"Q. 4. Were the proposals for furnishing the pressure stills received through the mail by the defendant at its office in Kansas City, Missouri? A. Yes.

"Q. 5. If you answer question No. 4 'yes,' then state whether the defendant sent by mail from its office in Kansas City, Missouri, to plaintiff's office in Kansas City, Kansas, its order based on the proposals mentioned in question No. 4. A. No.

"Q. 7. What work, if any, was plaintiff required to do on the pressure stills after their delivery at defendant's plant in Kansas City, Missouri, before said stills were complete? A. Attach coke pots.

"Q. 8. How much time was consumed (a) in doing the work mentioned in question No. 7? (b) How many men were used? A. (a) Four or five days. (b) Four men.

"Q. 9. Did the contract require plaintiff to do anything on the 10,000, the 5,000 and the 2,500 barrels storage tanks after delivery at defendant's plant in Kansas City, Missouri, before they were ready for use? A. Yes.

"Q. 10. If you answer question No. 9 'yes,' state: (a) What work the contract required plaintiff to do on said tanks? (b) How long it took to perform said work? And (c) How many men were required in said work. A. (a) Set them up and test them. (b) About three or four weeks. (c) About fifteen men.

"Q. 11. Were the preheaters, pressure stills, dephlegmators and storage tanks all integral and indispensable parts of the oil refinery being built by defendant at its plant in Kansas City, Missouri? A. Yes.

"Q. 12. If your answer to the preceding question is 'yes,' did the plaintiff and defendant mutually intend that plaintiff should furnish all said parts or equipment at the time the order for the preheaters was accepted? A. No.

"Q. 13. How many days was defendant delayed in completing its refinery on account of plaintiff's failure to furnish the preheaters, pressure stills, dephlegmators and tanks within the time specified in the contracts? A. None.

"Q. 14. What date did the contract require delivery of: (a) Preheaters? (b) Pressure stills? (c) Dephlegmators? (d) Tanks? A. (a) As soon as possible after delivery of material to Kaw Boiler Works Company.

"Q. 15. When was delivery made at the Interstate Refinery of: (a) Preheaters? (b) Pressure stills? (c) Dephlegmators? (d) Tanks? A. (a) One May 8th, one May 18th, 1923. (b) April 20, May 2d, 1923. (c) April 11, 1923. (d) About April 30, May 10, May 15, 1923.

"Q. 16. Were the preheaters, the pressure stills, the dephlegmating towers and the tanks all necessary elements in the refining plant being constructed by the defendant at its plant in Kansas City, Missouri? A. Yes.

"Q. 17. Were the instruments sometimes called requisitions, sometimes called acceptances, and sometimes called orders, accepted in writing by plaintiff and mailed to defendant in the course of United States mail? A. No."

The defendant contends it is not liable for the equipment because the plaintiff was not licensed to do business in Missouri; that the contracts were made in Missouri; that the work performed by plaintiff was, at least in part, performed in Missouri; that Missouri has a statute providing that if a foreign corporation shall, without license, do local business in Missouri it cannot maintain an action on account thereof.

Plaintiff contends that the contracts were made in Kansas; that the equipment was manufactured or fabricated in Kansas, was accepted by defendant in Kansas; that, as to some of the equipment, while it was fabricated in Kansas, it was too bulky to be shipped set up, and the erection thereof alone was done in Missouri; that, as to this, the erection in Missouri was but an incident of a valid interstate transaction, and hence not within the Missouri statute. The Missouri statutes require, as a condition precedent to doing business in that state, that a foreign corporation shall obtain a license to do business. It is conceded that plaintiff had no such license.

The defendant contends that the plaintiff maintained an office and transacted its business in Missouri. The evidence showed that F. G. Palmer and E. L. Hudson, president and vice president and manager of the plaintiff, are interested in another business known as Weimer Mortgage and Real Estate Company, which has no connection with the plaintiff company. The mortgage company has an office in the Waldheim building in Kansas City, Mo. The plaintiff's name appears on the office door, and in the office is a telephone listed in plaintiff's name. The plaintiff company pays a part of the rent of the office and the salary of a stenographer who works at the Kansas plant and occasionally in this Missouri office. Persons coming to Kansas City to transact business with the plaintiff company usually come to the Union Station in Kansas City, Mo., and communicate with this office. But so far as plaintiff's business is concerned, this Missouri office is used largely as a meeting place. Its directors' meetings are not held there, no books are kept there, no collections are made or received there, no contracts are made there, no goods sold there, no samples kept there. Plaintiff's books are kept and the business of the company is transacted in the Kansas office. It clearly appears that the contracts involved in this controversy were made in Kansas. But if they were to be performed in Missouri they were void. (*United Shoe Machinery Co. v. Ram-*

*lose,* 210 Mo. 631; *Booth v. Scott,* 276 Mo. 1; *United Shoe Machinery Co. v. Ramlose,* 231 Mo. 508, 545; *State, ex rel., v. Robinson,* 271 Mo. 475.) If they were to be and actually were performed in Kansas, then they were not void. The facts warrant the conclusion that they were to be performed in Kansas; that only incidental matters necessary to their completion were to be and were performed in Missouri.

There were four classes of equipment furnished: Two preheating stills, two pressure stills, two dephlegmating towers, and three storage tanks of 10,000, 5,000 and 2,500 barrels capacity, respectively. Each class of equipment was the subject of a separate contract, and each constituted an essential unit, performing an indispensable function in a new refining process for the defendant. The apparatus was intricate and complex both in its fabrication and in its operation. The process being new, no such equipment had theretofore been manufactured. It involved fabrication of steel of unusual quality, thickness and other dimensions. It was designed to work under unusual temperature and extraordinary pressure. It was necessary to procure special steel from Pennsylvania and to design special tools for its fabrication. Being experimental, changes in the plans and construction took place throughout the process of manufacture. Throughout the period of preparation of plans and process of fabrication, defendant's engineers, including Mr. Muehle, the inventor of the process, were at plaintiff's plant supervising and directing the work. Each separate contract consisted of a written order, personally delivered by a representative of defendant at the plant of plaintiff in Kansas City, Kan., and there, in writing, accepted by plaintiff.

On completion of the two pressure stills they were inspected by Muehle, as defendant's agent, and accepted at plaintiff's plant. On the bottom of each still was to be riveted a coke pot three or four feet in diameter and about the same in depth. When the stills were finished and accepted it was ascertained that the interstate commerce commission rules would not permit shipment of such large apparatus, on account of possible lack of clearance of bridges, etc. It was then agreed between the parties, and at the Kansas plant, that the stills should be shipped with the pots detached, to be attached by plaintiff after the stills were in place. On arrival at its plant in Missouri, the stills were unloaded and put in permanent place by the defendant. They were then attached to the coke pots

by plaintiff's men, who went from the Kansas plant for that purpose only. The item for attaching them amounted to $223.45.

The fabrication of the storage tanks consisted of the preparation of steel plates and cutting and curving them to proper dimensions. It was impossible to transport them when assembled because of their large dimensions, one being fifty feet in diameter. The defendant contends that the contract for their erection in Missouri pertained to a character of work that bore no inherent or intrinsic relation to the subject-matter of an interstate sale and that the contract for the pressure stills is void for the same reason. We cannot concur in that view. The apparatus was fabricated and assembled into a finished product in Kansas. As to the pressure stills, there remained the act of the attachment of the coke pots to the stills. The only thing that prevented the attachment in Kansas, and which required the attachment to take place in Missouri instead of Kansas, was the operation of the interstate commerce commission rules. The inspection and acceptance occurred in Kansas. So far as the tanks were concerned, the entire fabrication occurred in Kansas. The completed tank was temporarily set up to insure that the forms of assembled plates were properly united and would form a perfect whole. They were then taken down, and the plates, comprising five carloads, were loaded upon cars in Kansas and shipped to Missouri—so shipped because of their dimensions and the interstate commerce commission rule. The defendant prepared the foundations in Missouri, received and unloaded the interstate shipment and hauled it to the place of assembling. The plaintiff sent its experts and trained workmen from its Kansas plant to Missouri to assemble the parts. All tools used in such work were taken from plaintiff's plant and returned when the work was done.

The question turns upon the proposition of whether or not the things necessarily done in Missouri to complete the plant or the integral parts thereof under the contracts were incident to interstate commerce so as to constitute a constituent part of an interstate transaction.

The plaintiff argues that the courts of Missouri recognize that the statute invoked by the defendant is highly penal; that a defense made thereunder is a harsh defense; that it should not be allowed unless "the facts are such as to lead to no other conclusion."

In *Engine & Manufacturing Co. v. Apartment Co.*, 154 Mo. App. 139, a case involving the interstate sale of machinery and the furnishing of men to install and start it, it was said:

"The evidence is overwhelming to the effect that the Chuse Engine and Manufacturing Company manufactured this machinery and put it on its cars in Mattoon, sent it to St. Louis; that it was installed in the Vromania apartments; that they are receiving the benefits of this sale; and there is no defense whatever, except that they won't pay because the contract is illegal. Now, that is a hard position to take. That is to say, it is a hard contract not to enforce. It would be a hardship, in other words, upon the Chuse Engine and Manufacturing Company if the contract were illegal. And, inasmuch as the statute provides for a penalty, the contract must be strictly construed; that is to say, whether or not it is within the purview of the statute. If there is some reason to exclude this contract and this sale from the operation of the statute, in all good conscience it should be done. If, on the other hand, the facts are such as to lead to no other conclusion but that this contract is illegal, then this court has nothing to do but to declare it illegal." (p. 152.)

The court construed the spirit of the statute as applicable only where the foreign corporation had substantial property in the state, thereby enjoying the protection of its laws, under which circumstances it was proper that it should bear the burden incident to the protection of its property. Continuing, it was said:

"Clearly and beyond controversy, it had no property of any kind within this state, so it had none to be protected by our state, a reason stated by our supreme court and by this court in many cases underlying our law requiring foreign corporations to pay the license taxes or fees exacted; that enjoying the protection of the laws of this state for the property here situate, the foreign corporation should bear the burdens incident to the protection of that property." (p. 154.)

The Missouri statute in question does not prohibit foreign corporations from doing business in that state if such business is relevant to interstate commerce. The supreme court, in *International Textbook Co. v. Gillespie*, 229 Mo. 397, held that the acts there in question constituted doing business in Missouri, but that such acts did not bring the foreign corporation within the Missouri statute, because such acts were interstate in character. It was said:

"That while appellant is doing business in this state, yet the evidence shows that its business is confined to interstate business alone. That being true, it is not subject to state regulation within the meaning of said sections of our statutes, but is governed by the constitution of the United States and the laws thereof. We, therefore, hold said sections to be unconstitutional, null and void in so far as they apply to and affect appellant and all foreign corporations engaged in interstate commerce." (p. 422.)

In *Corn Products Mfg. Co. v. Candy & Bakers' Supply Co.*, 156 Mo. App. 110, it was said:

"In the very recent case of *United Shoe Machinery Co. v. Ramlose*, 231

Mo. 508, our supreme court cites approvingly many cases holding that what are now sections 1024, 1025 and 1026, *supra*, do not apply to such transactions, and do not close the courts of our state to the seller, a foreign corporation, attempting to enforce the contract of sale against the buyer. So, too, it is held by that court, in *International Textbook Co. v. Gillespie*, 229 Mo. 397, following that of the supreme court of the United States in *International Textbook Co. v. Pigg*, 217 U. S. 91, followed by this court in *Chuse Engine & Manufacturing Co. v. Vromania Apartment Co.*, 154 Mo. App. 139, 133 S. W. 624, and *Koenig v. Truscott Boat Manufacturing Co.*, 155 Mo. App. 685, . . . that these sections of our statute cannot and do not apply to interstate commerce. The whole subject is so fully covered by these decisions that it is unnecessary for us to do more than refer to them as conclusive in this case." (p. 116.)

The question being one of interstate commerce, the decisions of the supreme court of the United States are decisive.

In *York Mfg. Co. v. Colley*, 247 U. S. 21, a case in which a Pennsylvania corporation agreed to make and ship into the state of Texas ice-manufacturing machinery, the contract provided that the machinery was to be erected and connected by plaintiff in Texas, and when done was to be operated by plaintiff for the purpose of testing and demonstrating its operation. About three weeks' time was consumed in the erection and a week in its operation. The court held that the work done in Texas was relevant and appropriate to the interstate transaction, and that the Texas foreign corporations act did not and could not apply. It was held that the right to engage in interstate commerce embraces the doing in the local state of "that which is relevant or reasonably appropriate to the interstate transactions"; that "the right to make an interstate commerce contract includes in its very terms the right to· incorporate into such contract provisions which are relevant and appropriate to the contract made" (p. 24); that the "only possible question open" under such conditions as here exist is whether the particular provision of the contract "to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery was relevant and appropriate to the interstate sale of the machinery" (p. 25); and that where the intrinsic value of the thing covered by the contract largely depends upon its being united and made operative as a whole, then the contract so to do is relevant and appropriate to the interstate transaction and is not within the statute.

The rule was followed in *Hess Warm. & Vent. Co. v. Grain Elevator Co.*, 280 Mo. 163, wherein an Illinois corporation agreed to

manufacture and deliver in Missouri a grain-drying machine which was to be assembled and installed by the seller in the latter state. Also, in *State, ex rel., v. Robertson,* 271 Mo. 475, 485, wherein it was said:

"We are of opinion that any foreign corporation without taking out a license in Missouri (under the statute in question) can, under the commerce clause of the federal constitution, unhindered wholly by us, or by the laws of this state, sell its type-casting machines or other commodities to citizens of this state under such terms as it sees fit (*Kansas City v. McDonald,* 175 S. W. 917; *Wulfing v. Cork Co.,* 250 Mo. 731); that it can likewise sell repair parts to purchasers of its products or machines, and agree to send its skilled workmen and operatives into this state, at the expense of the users of its machines, to erect the same and teach the manner of the operation thereof (*Milan Milling Co. v. Gorten,* 93 Tenn. 590; *Flint & Walling Mfg. Co. v. Mc-Donald,* 21 S. D. 526)."

The defendant relies upon *Browning v. Waycross,* 233 U. S. 16, and *General Railways Signal Co. v. Virginia,* 246 U. S. 500. Without entering into a discussion of those cases, it may be observed that the facts and principles of both cases were discussed and distinguished by the court in *York Mfg. Co. v. Colley,* supra. The principles announced in the latter case are, in our judgment, applicable to the facts of the instant case, while the principles of the former cases do not apply. The various assignments of error have been considered. They all relate, directly or indirectly, to the matters discussed. We find no error which would warrant a reversal.

The judgment is affirmed.