**EDGEWATER REALTY CO. v. TENNES-
SEE COAL, IRON & RAILROAD CO.**

No. 1731.

District Court, D. Maryland.

March 31, 1943.

808

Piper, Watkins & Avirett and James Piper, all of Baltimore, Md., for plaintiff.

Semmes, Bowen & Semmes and Richard F. Cleveland, all of Baltimore, Md., for defendant.

COLEMAN, District Judge.

This is a suit for alleged breach of contract and is before the Court on defendant's motion to dismiss the action and to quash return of service of summons on the ground (1) of improper venue, namely, that the defendant is a Tennessee corporation and not subject to service of process within the State and District of Maryland; and (2) on the ground of lack of jurisdiction, namely, that the defendant is not now and has not at any time, been doing business within the State and District of Maryland. There is, however, no dispute as to the sufficiency, that is, the manner of the service itself upon the defendant, which was made in three ways: (1) on defendant's representative in Baltimore; (2) on the joint Maryland representative of both the defendant and the plaintiff in connection with the project involved, and (3) on the Maryland State Tax Commission.

A brief statement of the cause of action as set forth in the bill of complaint, and of the testimony developed at the hearing on the motion to dismiss, is appropriate for a proper understanding of the precise questions involved in the motion.

The plaintiff, the Edgewater Realty Company, hereinafter referred to as Edgewater, is a Maryland corporation, with its principal office and place of business in Baltimore, engaged in the business of low-cost housing real estate development and in the construction of low-cost houses in the State of Maryland. The defendant, the Tennessee Coal, Iron and Railroad Company, hereinafter referred to as the Tennessee Company, is a Tennessee corporation with its principal office and place of business in Birmingham, Alabama. It owns and operates iron, ore and coal mines and manufacturing plants in the vicinity of Birmingham, and produces pig iron and steel products, including pre-fabricated low-cost steel houses. In March, 1941, it entered into a contract with the Federal Government through the Public Buildings Administration, Federal Works Agency, "to furnish the materials and perform the work for the construction" at Indian Head, Maryland, of fifty (later increased to fifty-eight) prefabricated, demountable dwelling houses. It is not contended that the land on which the houses were to be constructed actually belonged to the Federal Government. About the same time, defendant entered into a sub-contract with Edgewater whereby it undertook to furnish to Edgewater the principal steel parts, namely, large steel sheets and certain accessories, required in the erection of these houses under Tennessee Company's contract with the Government, this steel being generally referred to as Panelbuilt Units. The Tennessee Company was to be paid a specified price per unit, and Edgewater was to do all work and furnish all other material and facilities of every kind necessary to complete erection of the houses. Edgewater, in other words, was to assume as between itself and the Tennessee Company all of the Tennessee Company's obligations under the latter's contract with the Government, but the Government still looked to the Tennessee Company only, for complete performance.

Edgewater claims that these units were faulty in design, that when furnished to Edgewater, they were in a development stage and contrary to the representations

which the Tennessee Company had made in regard to them, with the result that Edgewater has suffered great loss and damage, including loss and damage due to failure on the part of the Tennessee Company to complete its delivery of the units as it had contracted to do, which resulted in a large increase in Edgewater's overhead expense which had to be absorbed by Edgewater in the cost of the houses.

■ Coming now to the precise questions raised by the Tennessee Company's motion to dismiss and to quash return of service of summons, and considering the first ground of this motion, namely, improper venue, it is necessary at the outset to distinguish clearly between "venue" and "jurisdiction". The former connotes locality, the place where the suit should be heard; the latter connotes the power to decide a case upon the merits. Interior Construction Co. v. Gibney, 160 U.S. 217, 16 S.Ct. 272, 40 L.Ed. 401; The Resolute, 168 U.S. 437, 18 S.Ct. 112, 42 L.Ed. 533. Since the jurisdiction of this Court in the present suit is grounded upon diversity of citizenship of the parties, whether this Court is the proper forum is governed by Section 51 of the Judicial Code, 28 U.S. C.A. § 112, which provides that "* * * where the jurisdiction is founded only on the fact that the action is between citizens of different States, suit shall be brought only in the district of the residence of either the plaintiff or the defendant." It is well settled that for the purposes of this section, "citizen", "inhabitant" and "resident" are synonymous terms and that, therefore, a corporation is a resident only of the State of its incorporation, and of the District (when that State comprises more than one District) of the corporation's head office,—Shaw v. Quincy Mining Co., 145 U.S. 444, 12 S.Ct. 935, 36 L.Ed. 768; In re Keasbey & Mattison Co., 160 U.S. 221, 16 S.Ct. 273, 40 L.Ed. 402,—and until very recently the requirement of Section 51 could not be waived. See Neirbo Co. v. Bethlehem Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437. Thus, since Edgewater is a Maryland corporation, we find no difficulty as respects the question of venue.

Turning to the question of jurisdiction, that is more involved because it is stipulated that the Tennessee Company has never qualified or registered to do business in Maryland pursuant to the requirements of the Maryland law, and it is well settled that, in order to hold a foreign corporation, not licensed to do business in a State, responsible under the process of a local court, it must be clear that such corporation was "doing business" within that State at the time of service. International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537; Cannon v. Time, Inc., 4 Cir., 115 F.2d 423. As already stated, the ground of the Tennessee Company's motion to dismiss on the ground of lack of jurisdiction is based upon the assertion that it is not now doing, and never has done any business within the State and District of Maryland. Therefore, at the hearing on the motion, considerable testimony was presented by both sides for the purpose of developing the facts on this point. Summarized, we find that the weight of the credible evidence establishes the following facts:

The Tennessee Company and the Carnegie-Illinois Steel Corporation are subsidiaries of the United States Steel Corporation. They have a joint district office in Washington, D. C., which, for sales purposes, includes in its territory, known as the Washington district, the District of Columbia, Maryland and Virginia. That office is in charge of a manager of sales who acts in that capacity for both companies, and he, in turn, has a branch office for both companies in Baltimore under the direction of a joint representative, known as assistant to the manager of sales. The expenses of the latter office, including the salary of this assistant, are paid directly by the Carnegie-Illinois Steel Corporation, but 8% or 9% of the overhead cost of operating in the District, including the branch office in Baltimore,—which is the only branch office in the district territory,—is pro-rated and charged to the Tennessee Company. Both the Tennessee Company and the Carnegie-Illinois Steel Corporation are listed in the Baltimore telephone directory, but the Baltimore office carries only the name of the latter on its door.

The Baltimore manager does a large business in soliciting tonnage for the Carnegie-Illinois Steel Corporation but, because of freight rate differentials, he solicits no business for the Tennessee Company in Baltimore since a better price on orders for shipment to Maryland can be accorded by filling them in Pittsburgh, where the Carnegie-Illinois Steel Corpora-

tion mills are located, than in Birmingham, Alabama, where the mills of the Tennessee Company are located. The Baltimore manager did solicit and fill one order in Baltimore, but that was eleven or twelve years ago. The Tennessee Company conducts no sales business in Baltimore with or for the Carnegie-Illinois Steel Corporation.

No books or accounts of any kind are kept in Baltimore for the Tennessee Company. No stationery has gone out of the Baltimore office bearing the letterhead of the Tennessee Company, but only of the Carnegie-Illinois Steel Corporation, and the manager of the Baltimore office had nothing to do with negotiating or making the contract with Edgewater which is the subject of the present suit. All of this was done by the sales engineer of the Tennessee Company, with offices in Birmingham and Washington. The contract was actually executed in the former place and the material shipped direct from Birmingham to Edgewater. This sales engineer personally supervised the work as it progressed under the contract every week, and six other employees of the Tennessee Company came to Maryland from time to time, to look over the work. On occasions, when they found joists—of which there were over four hundred in all,—were not properly welded, they employed welders to do the necessary work and, also, they ordered other repair work done, such as lowering ceilings and fixing leaks in roofs. Although movability of the low-cost panelbuilt houses was not specifically embraced in the contract, it was one of the special features claimed for these houses, so representatives of the Tennessee Company demonstrated the movability of one of these houses, during which it was taken down, its various parts loaded in trucks and moved about and the house was then re-constructed on its original location.

While the project was being carried on, shipments of material moved by both rail and motor carrier from the Tennessee Company to Edgewater over a period of four or five months. The Vice President of Edgewater represented both his own company and the Tennessee Company as superintendent on the project, but he never received any compensation from the latter. The time allowed the Tennessee Company by the Government for completing construction of the dwelling units was one hundred and fifteen calendar days, with provision for liquidated damages in case of unexcused delays. No representatives of the Tennessee Company were present at the project site after December, 1941. The present suit was not filed until September 3rd, 1942.

At or about the time that the project was being carried on, the Tennessee Company submitted bids, through its Washington office, to governmental agencies for the supplying of its products for use in the construction of dwellings or other buildings at several other points in Maryland, but none of these bids was ever accepted.

■ Since it is well settled that, in the absence of consent or "doing business", there is no basis for the assertion of jurisdiction over a foreign corporation,—Riverside Cotton Mills v. Menefee, 237 U.S. 189, 35 S.Ct. 579, 59 L.Ed. 910; Rosenberg Co. v. Curtis Brown Co., 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372,—and since there has been no consent in the present case, it becomes necessary to determine whether the facts, as just set forth, do amount to "doing business" as that phrase is legally defined.

■■ The Supreme Court has attempted to define the phrase "doing business", saying that a corporation is subject to the jurisdiction of the State if the business "be such in character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of the district in which it is served,"—St. Louis S. W. Ry. v. Alexander, 227 U.S. 218, 227, 33 S.Ct. 245, 248, 57 L.Ed. 486, Ann.Cas.1915B, 77,—or, if it is carrying on business "in such sense as to manifest its presence within the state, although the business transacted may be entirely interstate in its character." International Harvester Co. v. Kentucky, supra, 234 U.S. page 589, 34 S.Ct. page 947, 58 L.Ed. 1479. In other words, the prerequisite required by the decisions of the Supreme Court is that there must have occurred something more than the doing of a single act.

■■ Next, while it is settled that the Supreme Court accepts the decision of the highest court of a State as to what constitutes "doing business" in that State, within the meaning of its laws imposing preliminary conditions on foreign corporations, the Court, however, will determine for itself whether what was done by the particular corporation was interstate commerce, and whether the State requirements as applied to it are repugnant to the commerce clause of the Federal Constitution, art. 1, §

8, cl. 3. Kansas City Steel Co. v. Arkansas, 269 U.S. 148, 46 S.Ct. 59, 70 L.Ed. 204. That is to say, while it has been repeatedly decided that a foreign corporation, if "present" within the State by reason of its "doing business" there, is not exempt from suit solely because engaged in interstate commerce, it, nevertheless, is not suable there if the assertion of jurisdiction operates as an unreasonable burden on such commerce. See International Harvester Co. v. Kentucky, supra; Davis v. Farmers' Co-operative Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996; Atchison, T. & S. F. Ry. Co. v. Wells, 265 U.S. 101, 44 S.Ct. 469, 68 L.Ed. 928; International Milling Co. v. Columbia Transit Co., 292 U.S. 511, 54 S.Ct. 797, 78 L.Ed. 1396.

An examination of the decisions of the Court of Appeals of Maryland does not disclose any case, the facts in which are closely analogous to those presented in the present case. But see Crook v. Girard Iron Co., 87 Md. 138, 39 A. 94, 67 Am.St. Rep. 325; Stewart Fruit Co. v. Railroad Co., 143 Md. 56, 121 A. 837; Grove Lime Co. v. Wolfenden, 171 Md. 299, 188 A. 794.

Of all the decisions by the Supreme Court involving this precise question, and such decisions are very numerous, York Mfg. Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963, 11 A.L.R. 611, and Kansas City Steel Co. v. Arkansas, supra, appear to involve facts that bear the greatest similarity to the facts in the present case. In the first of these cases, pursuant to an interstate contract for sale of a complicated ice-making plant, it was provided that the parts should be shipped into the purchaser's State, and that the plant should be there assembled and tested under the supervision of an expert to be sent by the seller. The purchasers agreed to pay such supervisor a per diem while so engaged and to furnish mechanics for his assistance, and the purchaser's obligation to accept the plant was made dependent upon the test being satisfactory. The erection of the plant and the testing consumed some four weeks in all. Following a dispute as to performance under the contract, the seller sued for the contract price, and the purchaser answered by alleging that the seller was a foreign corporation, that it maintained an office and transacted business in the purchaser's State without having obtained a permit so to do, and that, therefore, under the State laws it was not authorized to prosecute the suit in the courts of the State. The seller rejoined that the contract sued on involved interstate commerce and that the State statute, if held to apply, was repugnant to the Constitution.

The lower court found that the contract of sale was interstate in character, but, nevertheless, concluded that the stipulation as to supervision by an engineer to be sent by the seller involved intrastate commerce wholly separable from the interstate transaction, and held that the seller, by carrying out that provision, had engaged in local business in the State, and since the permit required by the State statutes had not been secured, the suit was dismissed. The Supreme Court, however, reversed the lower court and said, through Chief Justice White (pages 25, 26 of 247 U.S., page 432 of 38 S.Ct., 62 L.Ed. 963, 11 A.L.R. 611): "The only possible question open therefore is: Was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale —the ice plant purchased—might come into existence. In its essential principle therefore the case is governed by Caldwell v. North Carolina, 187 U.S. 622, 23 S.Ct. 229, 47 L.Ed. 336, Rearick v. Pennsylvania, 203 U.S. 507, 27 S.Ct. 159, 51 L.Ed. 295, and Dozier v. Alabama, 218 U.S. 124, 30 S.Ct. 649, 54 L.Ed. 965, 28 L.R.A.,N.S., 264. In fact those cases were relied upon in the Waycross case [Browning v. Waycross, 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828] as supporting the contention that a mere agreement for the erection of lightning rods in a contract made concerning the shipment of such rods in interstate commerce caused the act of erection to be itself interstate

commerce. But the basis upon which the cases were held to be not apposite, that is, the local characteristic of the work of putting up lightning rods, not only demonstrates beyond doubt the mistake concerning the ruling as to the Waycross case which was below committed, but serves unerringly to establish the soundness of the distinction by which the particular question before us is brought within the reach of interstate commerce.

"Of course we are concerned only with the case before us, that is, with a contract inherently relating to and intrinsically dealing with the thing sold, the machinery and all its parts constituting the ice plant. This view must be borne in mind in order to make it clear that what is here said does not concern the subject passed on in General Railway Signal Co. v. Virginia, 246 U.S. 500, 38 S.Ct. 360, 62 L.Ed. [854], since in that case the work required to be done by the contract over and above its inherent and intrinsic relation to the subject-matter of the interstate commerce contract involved the performance of duties over which the state had a right to exercise control because of their inherent intrastate character. In fact the case last referred to when looked at from a broad point of view is but an illustration of the principle applied in the Waycross case to the effect that that which was inherently intrastate did not lose its essential nature because it formed part of an interstate commerce contract to which it had no necessary relation. And this truth by a negative pregnant states the obverse view that that which is intrinsically interstate and immediately and inherently connected with interstate commerce is entitled to the protection of the Constitution of the United States resulting from that relation."

In the other and later case of Kansas City Steel Co. v. Arkansas, supra, a Missouri corporation, without first obtaining permission to do business in Arkansas, successfully bid for the construction of a bridge in Arkansas; executed the contract in Arkansas, also a bond; sublet all the work except the steel super-structure to a Kansas firm; shipped structural materials from Missouri to itself in Arkansas; delivered them there to the sub-contractor which used them in its part of the work; and proceeded with the manufacture in Missouri of materials to be used by itself on the super-structure. The Court held that these activities, which apparently extended over several months, viewed collectively and with special reference to the local delivery of materials, were partly intrastate in character, and that infliction of a penalty for non-compliance with the Arkansas corporation law was not repugnant to the commerce clause of the Constitution. The Court said (pages 151, 152 of 269 U.S., page 60 of 46 S.Ct., 70 L.Ed. 204): "But in the case now before the court the construction of the bridge necessarily involved some work and business in Arkansas, which were separate and distinct from any interstate commerce that might be involved in the performance of the contract. From the beginning, transactions local to Arkansas were contemplated. In fact, plaintiff in error obtained permission to do business in Arkansas in order to be authorized to erect the steel superstructure—the part of the work it had not sublet. But, before obtaining such permission, it made the bid and signed the contract in Arkansas; it shipped from Kansas City to itself at Wilmot the materials for the performance of the work it had sublet, and, after the interstate transit had ended, delivered them to the subcontractor who used them in the work. We need not consider whether, under the circumstances shown, the making of the bid, the signing of the contract, and execution of the bond would be within the protection of the commerce clause, if these acts stood alone. But it is certain that, when all are taken together, the things done by plaintiff in error in Arkansas before obtaining the permission constitute or include intrastate business. *The delivery of the materials to the subcontractor was essential to the building of the bridge, and that was an intrastate and not an interstate transaction. The fact that the materials had moved from Missouri into Arkansas did not make the delivery of them to the subcontractor interstate commerce.* So far as concerns the question here involved, the situation is the equivalent of what it would have been if the materials had been shipped into the state and held for sale in a warehouse, and had been furnished to the subcontractor by a dealer. We think it plain that the plaintiff in error did business of a local and intrastate character in Arkansas before it obtained permission. General Railway Signal Co. v. Virginia, 246 U.S. 500, 38 S.Ct. 360, 62 L.Ed. 854; Browning v. Waycross, 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828; York Mfg. Co. v. Colley, 247

U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963, 11 A.L. R. 611." (Italics inserted.)

We have found no reported decision of District or Circuit Courts of Appeals cases with facts as close to the facts in the present case as those in York Mfg. Co. v. Colley, and Kansas City Steel Co. v. Arkansas, supra. For a recent consideration by the Circuit Court of Appeals for the Fourth Circuit, of the question as to what constitutes "doing business", so as to subject a foreign corporation to local jurisdiction, see Cannon v. Time, Inc., supra. See also Frene v. Louisville Cement Co., App.D.C., 134 F.2d 511, decided January 25, 1943. Many of the cases, both State and Federal, are collected in 11 A.L.R. 614–621, and 101 A.L.R. 360–365. As respects the great variety of so-called "installation" cases, generally speaking, the weight of authority is to the effect that if the local act, after the interstate shipment has been completed, is merely incidental to the interstate sale, i. e., if the installation may be said to be inseparable from the sale, the transaction is protected by the commerce clause, otherwise not. Refusal to treat the work done locally as separable, has generally been applied in the case of those installations requiring special skill and apparatus, such as installation of an ice-manufacturing plant, a pipe organ, an acetylene gas plant and an elevator. But the contrary has been applied in the case of lightning rods, sprinkler systems, theatre or hotel fixtures and furnishings, and advertising signs. The extent to which ordinary or readily available local labor is required to be employed to complete the installation, also becomes an important element. See 23 Opinions of Attorney General of Maryland (1938), 173.

In a decision of the Supreme Court of Kansas, Kaw Boiler Works Co. v. Interstate Refineries, 118 Kan. 693, 236 P. 654, writ of certiorari denied 269 U.S. 595, 46 S.Ct. 104, 70 L.Ed. 431, there was presented a situation somewhat akin to the one in the present case.

There, a Kansas corporation, not qualified to do business in Missouri, contracted with a Delaware corporation to furnish and install the equipment for an oil refinery for the latter in Missouri, the entire apparatus being fabricated in Kansas, set up there and tested, then taken down and shipped in pieces. The purchaser prepared the foundations for the machinery, unloaded the interstate shipments and hauled the machinery to the place of erection, where it was assembled and erected by the seller which had sent trained men and all the necessary tools from Kansas for that purpose. The entire job apparently was a matter of only a few weeks. The purchaser contended that under the highly penal Missouri law, where the equipment was erected (although the court found the contract was made in Kansas), the seller had no right to maintain an action on the contract, because the seller was not qualified to do business in Missouri, and by the Missouri law, the contract was void. However, the Court held, relying upon York Mfg. Co. v. Colley, supra, that the things done in Missouri to complete the installation were incident to a transaction in interstate commerce which was not governed by State law.

The facts in the present case lie somewhat between those in York Mfg. Co. v. Colley and Kaw Boiler Works Co. v. Interstate Refineries, supra, and those in Kansas City Steel Co. v. Arkansas, supra. Which do they more closely approach? Did the fact that the Tennessee Company maintained a Baltimore branch office, and had bid for contracts for material to be shipped into Maryland for other projects there, amount to its being "present" within the State of Maryland, and, therefore, to "doing business" within legal contemplation? Was the part which the Tennessee Company played in connection with the erection of the houses for Edgewater merely incidental to the sale to Edgewater of the prefabricated material for such houses? All of these facts must be considered together. Even if we answer in the negative the first question just stated, the Tennessee Company may, nevertheless, still have been "doing business" in Maryland, unless we can answer the second question just stated in the affirmative.

We feel we must answer the first question in the negative, because, actually, the so-called office of the Tennessee Company in Baltimore was not in operation as an office of that Company, but as an office of its affiliate, the Carnegie-Illinois Steel Corporation. It is conceded that there was no such connection between the two companies as to destroy their separate legal entity and identity. Furthermore, there is nothing in the testimony to indicate,—nor is it contended,—that the one was the agent of the other. Also, even if the solicitation of other contracts may be assumed to have been shared in by the Tennessee Company's representatives in

Baltimore, such would not be sufficient to constitute doing business. As was said in Cannon v. Time, Inc., supra, 115 F.2d 423, at page 425, "Even if the News Company be considered the agent of defendants in accepting and collecting for subscriptions, it does not follow that the defendant should be held present and doing business within the state. Mere solicitation of business by an agent does not constitute such a doing of business as to subject a foreign corporation to the local jurisdiction; and the situation is not changed by the fact that the agent may collect some money in connection with the business solicited."

As respects the extent of the interstate business, and including therein everything which the Tennessee Company did from the very inception of its negotiations with the plaintiff until their relations in connection with the project with Edgewater ended and Edgewater filed the present suit, we must eliminate at the outset the solicitation of the contract, although clearly interstate because such solicitation took place entirely through the home and the Washington offices of the Tennessee Company. There remains, then, to be determined whether the work which the Tennessee Company did through its engineer, and supervisors, and through the independent contractors whom they employed on several occasions, in order to make good certain defects in the material which it had furnished, was of a character and extent sufficient to require it to be treated as not merely incidental to the interstate shipment of the material, but as local work.

■ We are quite aware of the fact that, generally speaking, a single transaction even though substantial in character is not sufficient to amount to "doing business". See Hunau v. Northern Region Supply Corp. D.C., 262 F. 181. There must be something more than an isolated circumstance to constitute "presence" within the State. But all facts considered, we are inclined to the view that the Tennessee Company was "present" and "doing business" in the State of Maryland by virtue of the extent and character of what its representatives and workmen there did for Edgewater. In the first place, unlike the situation in York Mfg. Co. v. Colley, and Kaw Boiler Works Co. v. Interstate Refineries, and more akin to the situation in Kansas City Steel Co. v. Arkansas, supra, the erection of the buildings and completion of the project extended over a considerable period of time,—six or seven months. In the York Mfg. Co. case only one month was involved. While, of course, the test cannot be made one solely of time, there are other considerations which, when taken into account with the length of the operation, we feel justify our conclusion. For example, the sales engineer of the Tennessee Company was on hand every week, and six other of its employees were from time to time engaged in directing the work, not to mention the Vice President of Edgewater, who was designated, apparently, as sort of an over-all joint representative of both Edgewater and the Tennessee Company. Further, on several occasions in order to overcome defects in various features of erection, the Tennessee Company employed, on its own account, independent contractors,—welders and others.

A situation of this kind must be viewed in a practical light. Legal principles must not be strained or lines drawn too finely so as to render unreasonable what has been laid down as fundamental guides in cases of this class. The problem is not always simple, and the facts in each separate case must be carefully analyzed and weighed. In the present case, the facts admittedly present a borderline situation, but for the reasons stated, we are satisfied that they are sufficient to constitute a finding of such activities on the part of the Tennessee Company within the State of Maryland as to constitute "doing business" within that State, without doing violence to any constitutional principle based upon due process or the commerce clause, if we apply a reasonable interpretation of the Supreme Court decisions which we have just reviewed. We question whether, in the Kaw Boiler Works Co. case, the Kansas Supreme Court, faced with the highly penal provisions of the Missouri law, did not go too far in applying the doctrine of the York Mfg. Co. case,—at least we are not prepared to follow the Kansas case as applied to the present facts.

While in one sense a single undertaking, what the Tennessee Company did involved a great deal of purely local work. It is true that what the Tennessee Company agreed to do by its contract with Edgewater was merely to furnish the Panelbuilt Units and Edgewater agreed to erect them. Also, there is no express provision in the contract as to the character or extent of supervision by the Tennessee Company of putting the units in place by Edgewater other than that

"The Tennessee Company shall reimburse Edgewater for any additional field labor caused by errors, if any, in the fabrication and/or correctness of design of the Panel-built Units." Because of considerable difficulties along these lines, apparently it became necessary for the Tennessee Company not merely to supervise the work rather constantly through its own representatives, but actually itself to undertake a considerable amount of the "additional field labor caused by errors," just referred to.

So, shorn of all technical refinements, the question to be answered is simply this: May a corporation come into a State and directly participate, not merely through its own representatives but with local labor employed by it, over the major portion of a year, in an essential part of the construction of a whole community of dwelling houses and then be heard to say that it has nevertheless not been "doing business" in that State by reason of the fact that the material upon which it has expended this labor has been brought, in a pre-fabricated condition, from another State? We do not think so. We are not suggesting that the answer to this question is to be determined by any particular size of the local payroll any more than by a particular number of days or hours that the foreign corporation is engaged in work within the State. But if these items are of substantial size, as they were in the present case, we believe such is sufficient to constitute "doing business". Certainly, working off and on in an essential feature involved in the construction of a whole community of dwelling houses is quite different from erecting lightning rods, or installing an electric refrigerator, or assembling and testing a single ice-making plant.

Since the present suit was not filed and service had until the greater part of a year after the Tennessee Company's representatives and employees discontinued all work on the project and left the State, there remains to be considered the point whether, even assuming our conclusion is correct that what these representatives and employees did amounted to "doing business" within the State, the Tennessee Company was not immune to suit at the time the present action was brought and service had because it had, at that time, ceased to do business in the State. In other words, may this Court exercise jurisdiction over a foreign corporation which has done business within the District, but has ceased to do business at the time of service of process, as to a cause of action arising out of the business done within the State?

We think that this question must be answered in the affirmative if, by the law of Maryland at the time when the business was done, the Tennessee Company, by doing such business, thereafter subjected itself to the jurisdiction of Maryland. In other words, we consider that there is nothing unreasonable in the theory of continued jurisdiction which involves any violation of due process of law. The Supreme Court has so held. In American Express Co. v. Royster Co., 273 U.S. 274, 47 S.Ct. 355, 71 L.Ed. 642, the validity of the service upon a foreign corporation was challenged upon the ground that it had withdrawn from the State (Virginia) where it had acted as a common carrier, and was no longer doing business within that State within the meaning of the State's corporation laws, although summons was executed by delivering a copy of it to the Chairman of the State Corporation Commission and transmitting another copy to the defendant corporation by mail, pursuant to the provisions of the State law. The Supreme Court said (page 280 of 273 U.S., page 356 of 47 S.Ct., 71 L.Ed. 642): "Evidently the statute might reasonably be construed as intended to designate an agent upon whom process should be served in suits growing out of transactions within the state where the corporation had failed so to do. The state court gave the statute that effect and we are bound by the result."

Let us see then what the Maryland law provides. Section 119(b) of Article 23 of the Annotated Code of Maryland 1939, provides that "Every foreign corporation which has heretofore done or hereafter does intrastate or interstate or foreign business in this State shall be subject to suit in this State by a resident or non-resident of this State on any cause of action arising out of such business, *whether or not such foreign corporation has ceased to do business in this State.*" (Italics inserted.) Section 120(a) of Article 23, requires foreign corporations (with certain specified exceptions) doing intrastate or interstate business to have a resident agent in the State certified to the State Tax Commission, and to continue to have the same as long as the foreign corporation is subject to suit in the State. And Section 111(d) provides that upon failure to comply with this requirement, the corporation shall

be conclusively presumed to have designated the State Tax Commission as its true and lawful attorney, authorized to accept service of process on its behalf. In construing earlier related provisions of the Maryland corporation law, the Court of Appeals of Maryland said with respect thereto, in Boggs v. Mining Company, 105 Md. 371, page 386, 387, 66 A. 259, 261: "These sections, when properly construed together, provide, among other things, that where *any* corporation, domestic or foreign shall, while transacting business in this state, incur a liability here or make a contract with any resident of this state and shall thereafter cease to have an agent here, service of any writ or process issuing from the courts of this state, in respect to such liability or contract, may be made upon the president or any director or manager of the corporation, if he can be found in this state. In other words, that, if a foreign corporation comes here and transacts business and incurs liabilities here, it shall quoad those liabilities remain subject to the jurisdictions of our courts, even though after incurring the liabilities it may have removed its office and business to another state. With these laws upon our statute book staring it in the face, the defendant came here and transacted business, and in the course of that business incurred the liability for the enforcement of which the present suit was instituted. It cannot now be heard to say to the courts of this state that no jurisdiction for the purposes of this suit was acquired over it, by service of process according to our laws upon one of its directors residing within this state, because since incurring the liability it has removed its office to another state." See, also, Ben Franklin Ins. Co. v. Gillette, 54 Md. 212.

In view of our conclusions, it becomes unnecessary to consider further provisions of the Maryland corporation law, more particularly Section 119(d) of Article 23 of the Annotated Code of Maryland 1939, which provides for jurisdiction at the suit of a resident of the State or one having a usual place of business in the State on any cause of action arising out of a contract made within the State or liability incurred for acts done within the State, *"whether or not such foreign corporation is doing or has done business in this State."* (Italics inserted.) We will add, however, that if the conclusion which we have reached in this opinion be correct, it is difficult to see how the broad provisions in the Maryland

law just referred to can be upheld, in the face of the requirements for due process upon which our conclusion is based. We have been referred to no reported decision of the Maryland Court of Appeals or of any other Court which has interpreted that provision.

For the reasons set forth in this opinion, defendant's motion to dismiss the action and to quash return of service of summons must be overruled.